HUNTER *et al. v.* STATE.[*]

(En Banc. Dec. 22, 1924.)

[102 So. 282. No. 24148.]

1. CRIMINAL LAW. *Ordinarily, removal of attorney appointed for joint defendants, as to one of defendants, cannot be complained of by codefendants.*

Where a circuit judge, under the statute (section 1239, Hemingway's Code; section 1481, Code of 1906), appoints counsel for a number of persons jointly indicted for a capital felony, and subsequently removes the attorney so appointed as to one of the defendants, on the theory that the defense of one might be inconsistent with the defense of the others, ordinarily the only person who can complain is the person accused, who has been denied the services of such attorney; his codefendants ordinarily cannot assign error as to such action.

2. WITNESSES. *Witness not incompetent for failure to understand or believe doctrine of future rewards or punishments.*

Under section 1919 of the Code of 1906 (section 1579, Hemingway's Code), providing that religious belief or the want of it shall not render a person incompetent as a witness, a person may be a competent witness, although he does not understand or believe the doctrine of future rewards or punishments, said section makes a witness competent who might not be competent at common law. *Peters* v. *State*, 106 Miss. 333, 63 So. 666, cited.

3. CRIMINAL LAW. *Ordinarily introduction of blood-stained garments, found in possession of accused, without scientific test as to whether animal or human blood, not reversible error.*

In a prosecution for homicide, blood-stained garments, found in the possession of one of the accused persons, may be introduced in evidence, although no scientific test has been made to determine whether it is human blood or animal blood, and ordinarily the introduction of such garments would not be reversible error.

4. HOMICIDE. *Evidence of condition of deceased's body and blood stains at place of homicide not erroneous, where state depends on testimony of accomplice and circumstances.*

In the prosecution of a person accused of murder, where the state's evidence depends upon the testimony of an accomplice and circumstances, it is not reversible error to introduce in evidence the condition of the body and blood stains at the place the homicide was committed.

5. CRIMINAL LAW. *Conviction on impeached testimony of accomplice reversed.*

Ordinarily a conviction may be had upon the uncorroborated evidence of an accomplice, but, where the accomplice is barely intelligent enough to be a witness, and where his reputation for truth and veracity has been successfully impeached by unimpeached witnesses, and where such evidence is not corroborated sufficiently, and where there is strong testimony of an alibi by numerous witnesses, a conviction on such testimony of such impeached witness, will not be upheld.

SMITH, C. J., and HOLDEN, J., dissenting.

*Headnotes 1. Criminal Law, 17 C. J., section 3554; 2. Witnesses, 40 Cyc., p. 2203; 3. Criminal Law, 16 C. J., section 1227; Homicide, 30 C. J., section 434; 4. Homicide, 30 C. J., sections 434, 435; 5. Criminal Law, 16 C. J., section 1434.

APPEAL from circuit court of Hinds county.

HON. W. H. POTTER, Judge.

Lonnie Hunter and others were convicted of murder, and they appeal. Reversed and remanded.

*S. C. Broom* and *Geo. L. Teat,* for appellants.

Briefs not available to the reporter.

*F. S. Harmon,* Assistant Attorney-General, for the state.

Brief not available to the reporter.

Argued orally by *S. C. Brown* and *George L. Teat* for appellant, and *Francis S. Harmon,* for appellee.

The appellants and Phillip O'Berry were jointly indicted for the murder of Mrs. Nellie Mardis, a human being, in the second district of Hinds county, Miss. The defendants being without counsel, the circuit judge appointed S. C. Broom, one of the attorneys for appellants, as counsel to defendants, and each pleaded not guilty. Thereafter, as shown by special bill of exceptions, after the said Broom had conferred with all the defendants named in the indictment, the court stated to the said attorney that on account of the youth of Phillip O'Berry, and because the court feared that his interest and defense might conflict with the interest and defense of the other four, the court would withdraw from said attorney the defense of Phillip O'Berry, and would appoint separate counsel for him. Thereupon the court appointed another attorney to defend Phillip O'Berry, to which action of the court in withdrawing the appointment first made the other defendants, through their attorney, Broom, excepted. The state thereupon introduced Phillip O'Berry as a witness, whereupon the defendants, through their

attorney, objected to the testimony of this witness, on the ground that he is incompetent because of his youth and because of his mental deficiency, and, before he answered, asked the court to examine him. Thereupon the circuit judge asked the following questions.

"Q. How old are you? A. I don't know, sir.

"Q. You don't know how old you are? A. No, sir.

"Q. Have you ever been to school? A. Yes, sir.

"Q. How long did you go to school? A. About two years.

"Q. What did you study at school? A. The first reader.

"Q. Primer and first reader? A. Yes, sir.

"Q. Do you know what will happen to a man if he swears falsely? A. Yes, sir.

"Q. What will happen to him? A. I don't know, sir.

"Q. Do you know what will happen to him if he tells a lie? A. Yes, sir.

"Q. What? A. Be killed.

"Q. Phillip, who is your father? A. Addison O'Berry.

"Q. How long has it been since you went to school? A. About a week; I have been going all this year, except about a week."

Thereupon Phillip O'Berry stood aside, and Addison O'Berry, his father, was called and asked the following questions:

"Q. How old is Phillip? A. He will be 17 some time this month.

"Q. You are certain he is over 14? A. Yes, sir.

"Q. You say he will be 17 some time this month? A. Yes, sir." (Objection—Overruled—Defendant excepted.)

Thereupon the district attorney examined said witness, which examination will be hereafter referred to.

On cross-examination, Phillip O'Berry was asked certain questions pertaining to his knowledge and mental status, as follows:

"Q. How old did you say you were? A. I don't know, sir.

"Q. What county do you live in? A. Smith Station.

"Q. What state? A. I don't know the state.

"Q. What is the name of the country you live in? A. Smith Station.

"Q. Who is the President? A. On the plantation?

"Q. Or elsewhere? A. I don't know, sir. I live on the river side.

"Q. Who is the President of the United States? A. I don't know, sir.

"Q. Who is the Governor of the state of Mississippi? A. I don't know who the Governor is.

"Q. Who is the sheriff of Hinds county? A. I don't know, sir.

"Q. Can you count? A. A little.

"Q. How far can you count? A. About twenty.

"Q. Can you read and write? A. No, sir; I can't write.

"Q. Where do you go to school to? A. Mt. Beulah.

"Q. Is that a colored or a white school? A. White.

"Q. A colored college? A. A white college; white people teach.

"Q. Do you know how many months in a year? A. No, sir.

"Q. Or how many days in a week? A. Yes, sir.

"Q. How many? A. Five.

"Q. Do you know how many months in a year? A. No, sir.

"Q. Do you know how many weeks in a month? A. Five.

"Q. Do you know when Christmas comes? A. No, sir.

"Q. You don't know what day of the month it is? A. No, sir.

"Q. Or what it signifies? A. No, sir; I know when Christmas day is here.

"Q. Do you know what day of the month the Fourth of July comes on? A. No, sir. . . .

"Q. Do you know what happens to people when they commit murder? A. No, sir.

"Q. Do you know what murder is? A. No, sir.

"Q. Do you know what larceny is? A. No, sir.

"Q. You are sure you don't know what murder is? A. No, sir.

"Q. You would not attempt to say these men murdered anybody? A. No, sir.

"Q. You don't know whether they murdered anybody or not? A. No, sir; I don't know whether they murdered anybody, but I know they killed Mrs. Mardis.

"Q. You don't know what they do with people when they kill some one? A. No, sir.

"Q. You don't know whether they go to jail for that? A. I know they get in the jailhouse.

"Q. You don't know what else? A. No, sir.

"Q. Do you know whether or not it is a violation of the law to kill people? A. No, sir.

"Q. Do you know whether it is wrong to kill people or not? A. I know it is wrong to cut you up.

"Q. You don't know whether it is wrong to kill them or not? A. No, sir.

"Q. You don't know whether it is wrong to steal? A. Yes, sir; I know it is wrong to steal. If you steal, they will put you in jail.

"Q. They will put you in jail for stealing? A. Yes, sir.

"Q. That is at Smith Station? A. Yes, sir; if you steal at Smith Station, they will tell Mr. Perry.

"Q. You don't know whether that custom prevails anywhere else or not? A. No, sir.

"Q. Do you know whether it is wrong to tell stories? A. Yes, sir.

"Q. What happens to you when you tell a story? A. I don't know, sir. It is right to tell the truth.

"Q. You don't know what happens if you don't tell the truth? A. I know what happens to us.

"Q. What? A. Mamma and them whip us.

"Q. Did you ever hear of anybody going to jail for not telling the truth? A. No, sir.

"Q. That is not against the law, as far as you know? A. No, sir.

"Q. Were you ever a witness in a case before? A. No, sir.

"Q. Were you sworn when you went on the stand? A. What do you mean by that?

"Q. Did you take an oath? A. No, sir; Mr. Brown asked me if I knew anything about it.

"Q. When you went on the stand as a witness a while ago, were you sworn; did you take an oath; did anybody ask you to do anything when you went on the witness stand a while ago? A. No, sir.

"Q. Nobody instructed you or asked you to do anything? A. They said, if I know anything about it, to tell the truth.

"Q. When was that he told you that? A. Just a minute ago.

"Q. Who told you that? A. That man yonder (indicating).

"Q. Where? A. In that room yonder.

"Q. Who had you to do that? A. That man yonder (indicating).

"Q. That man up there? A. Yes, sir.

"Q. What did he say to you? A. I don't know, now. He said all something another to hold up their hands.

"Q. What did he swear you to do? A. To tell the truth, I reckon.

"Q.  Do you know what will happen if you swear to an untruth?  A.  Yes, sir.

"Q.  Are you aware of the fact, if you are telling the truth, these defendants will be hung?  Did you know that?  A.  No, sir.

"Q.  You don't know what would happen to them?  A.  No, sir."

At the end of the examination of this witness, the defendant moved to exclude all his evidence, which was overruled, and the defendant excepted.

This witness testified that Lonnie Hunter, Herman Williams, and Isom Hagan, Oscar Johnson, and himself killed the deceased; that they came to the station at Smith Station the night of the killing and engaged in a game of cards called "pitty-pat;" that the witness had no money to engage in the game, but that he held a flash light, and that the first thing said was by Herman Williams, who said that he wanted a pair of overalls; that Lonnie Hunter said, "Go over there and get them," and that Isom Hagan said, "Go over there and grab Mrs. Mardis," and that they went on; that they told him and Oscar Johnson to stay out and watch for them; that if they saw anybody coming to hollo, or let them know; that, after Lonnie Hunter, Herman Williams, and Isom Hagan went into the store, they heard a scuffling in the store, and that Oscar Johnson told the witness to go into the store, and that he refused to do so, and Oscar gave him a shove and he went into the store; that Isom had Mrs. Mardis around the waist, holding her; that he had her arms pinioned to her body; that Lonnie was hunting a butcher knife, and that Herman Williams said, "I have already cut her;" that she had been stuck in the breast with a knife; that the front of her dress was bloody, and she was trying to get loose, and that Herman was cutting her with the butcher knife; that Lonnie gave the witness a bottle, and told him to hit her with the bottle; that he hit her with it, and that the

bottle bursted and cut his hand; that his hand was cut between the thumb and first finger, and the other fingers cut on the other side; that Herman was cutting her, and Lonnie was hitting her everywhere; that he came out of the front door and went to the pump, which is down near the railroad, on the north side from the store; that he and Oscar went on down to the pump, and that the others came down there with some money; that the money was in "one of these big pocketbooks that you hang on your arm"; that Isom washed his shirt, and they divided the money and gave him a dime, which he went to Miss Emily Howard's store and spent; that nobody washed there, except he and Isom; that Isom's clothes were bloody on the sleeve and on his overalls; that, after they divided out the money, Isom got over the fence back of Mr. Jennison's, back of the pump, and went down by Mr. Jennison's; that Lonnie and Herman came back by the railroad with witness and Oscar Johnson, a short distance to a lumber pile, then turned and went home, and that the witness and Oscar Johnson came up the railroad; that Herman and Lonnie, after they got out of the store light, could not be seen; that they went between him and the store; that he (witness) went up the railroad with Oscar Johnson to the next crossing, and that Johnson's wife was there; that he went from there into the store of Miss Emma Howard and bought two Coca-Colas; that from the store he went to the churchhouse, and on home, and that Johnson went up the road towards the river; that he and Johnson went in different directions, and that after they separated he did not see Johnson any more that night.

He further testified that he was playing near the store that evening, and late in the evening it got cold, and he went home for his coat and came back and struck up with Oscar Johnson, and they played around a little that evening, and that they went down to the station house, and there Lonnie Hunter, Herman

Williams, and Isom Hagan were; that it was about dusk dark when they got to where these boys were playing cards.

Mr. G. M. Nelson testified for the state. He was in the logging business, and on the evening of the killing was working in front of the Mardis store up until 6:45 o'clock, loading logs; that he left at 6:45 in a Ford car, going in the direction of Vicksburg; that when he left Mrs. Mardis was alive and in the store; that he met two persons just this side of the Big Black Bridge—a negro named Hurt and his wife, who were going in the direction of the store. These negroes, Hurt and his wife, were introduced, and testified that they were working at Bovina on the day Mrs. Mardis was killed, and started to Smith Station; that they met Mr. Nelson, as testified to by him, and proceeded on to Smith Station, which was about one and three-fourths miles; that when they reached the store there was a light in the store, and that they called Mrs. Mardis, but got no answer; that he then proceeded up to Mrs. Mardis' residence and called for her there; that her sister at the house told him she was at the store; that he told her she was not there, and that this lady then went with him back to the store, and went in the store and found Mrs. Mardis dead, and began to scream; that Mr. Hill, a brother of Mrs. Mardis, came running down to the store, and that Mrs. Mardis was dead; that her body was lying over a can in the store. They further testified that they met several automobiles between Smith Station and Big Black Bridge.

Mr. Hill, the brother of the dead woman, testified that when he reached the store it was 7:30 o'clock; that the body of his dead sister was still warm and bleeding. He testified to the wounds on the body, and the blood spots on the counter and showcase, and in the showcase. Mrs. Mardis was stabbed several times, and her throat

was cut in two places, about one and one-half inches apart, clear back to the bone.

The sheriff was sent for. He and his deputies came and placed guards around the end of the gallery where the blood had flowed from inside the storehouse, and sent for Mr. Gant and his bloodhounds, who reached the scene somewhere around eleven o'clock that night. The dogs were placed at the end of the gallery, took up a trail, and proceeded down the road a piece in a southerly direction; then west, and into an old slough in the swamp, where a fresh track was seen in the soft mud around the slough, circled around, and trailed back to a place owned by Mr. Brown, and by his house to a house in his backyard. The officers and Mr. Gant knocked on the door, but obtained no answer. Mr. Gant then suggested that before breaking into the house they go up and notify Mr. Brown. They finally got Mr. Brown up, and returned, and the officers in charge at the little house in the yard said there was some one in there. They knocked, and, obtaining no answer, they broke into the house and Herman Williams and Lonnie Hunter were in bed, pretending to be asleep. They were fully dressed, except their shoes. They were asked questions, and stated that they had not been anywhere that night. They then took the bloodhounds back to the store, and they took up a trail and went in another direction and came back to the same place where Lonnie Hunter and Herman Williams were found by the first trailing. They then returned with the dogs to the scene of the homicide and examined around. They found some blood and a bloody nickle at the pump. They placed the dogs on trail, and they trailed to a fence, in a northerly direction, across the fence to a church, and down the road to the gravel highway, where the dogs lost the trail. On this trail they passed the house of Iky Dorsey. The dogs hesitated in front of the house, trailed around a little, took up the trail some few steps away, and

proceeded to the highway, but could follow the trail no farther.

They testified that when they crossed the wire fence, next to the pump and the railroad, they found bloody hand prints on a telephone post just inside of the wire fence.

The following day the room occupied by Isom Hagan was searched, and a pair of overalls found, having blood stains upon them. It appears that another person occupied the room generally with Hagan. Hagan stated, so the officers testified, that the overalls belonged to him, and that the blood on them was rabbit blood which had gotten on there on a rabbit hunt on Friday before the night of the killing. It appears that the officers were inquiring for some person with a cut hand, and Phillip O'Berry's father, learning of this, took Phillip to a Mr. Brown with whom he lived, and told him about the boy's cut hand. The boy testified that he went home the night of the killing; that his mother and another man were at home when he got there, and his father was away, and that his mother asked him about how he cut his hand, and he told them that he cut it up at Mr. Graham's; that he took the bloody rag off of his hand and threw it in the fire. The following day Oscar Johnson and Isom Hagan were arrested. The evidence does not show that there was any blood upon Lonnie Hunter's or Herman Williams' clothes, and no money was found upon either of the appellants, and the evidence does not show that the purse Phillip O'Berry testified was Mrs. Mardis' purse, was found. So far as the record shows, it was not found.

Mr. Brown, on whose place Lonnie Hunter and Herman Williams worked, testified that these boys were working in the field until about night, when they came out to do their work; that one of them worked with him, and the other with another man who lived in his house with him; that after doing their work they came into

the house and played the graphophone a while; that the white folks ate their supper, and, after they ate, the two boys, Lonnie Hunter and Herman Williams, ate their supper and left the house about 7:30 o'clock that night; that he did not see them again until he was aroused that night. Arch Kirkland, the other man who lived at that house, testified to the same effect.

Maggie Dodson was next introduced for the defense and testified that she remembered the night Mrs. Mardis was killed, and that she knew all of the defendants, and that she saw Hunter and Williams the night of the killing; that they came to her house about 8:30 o'clock, and she does not live very far from Mr. Brown; that her brother and mother were there at the time; that the boys were joking each other, and stayed a pretty good while.

Alex Castles was next introduced for the defendants, and said that he lived on the same plantation with Lonnie Hunter and Herman Williams; that he saw them the day of the killing, plowing in a field; that he saw them as late as four o'clock in the afternoon; that he and Ike Dodson were together that night; that he was there (at Castles' place) from seven to eight o'clock, and that Ike went back home; that Ike told him good-night, and that he (witness) stopped and got wood, and when he went in Lonnie and Herman had been to his house and gone.

Berry Castles testified that he knew Lonnie and Herman; that the night Mrs. Mardis was killed they came to his house and stayed there with him about an hour; that they came in and asked for Willie Crawford, the witness' stepson, and that they stayed at his house about an hour; that he could not tell what time it was that they came there; that there was a clock there, but he could not see it; that it was night, and that they sat there about an hour and left; that it was something like

a half or a quarter of an hour after they left when No. 3 ran.

Susie Dodson, next introduced, knew Lonnie and Herman, saw them the night the woman was killed—they came to her house—that she had gone to bed when they came, and did not notice the time; that they came and sat down and talked with the children.

Godi Dodson, next introduced, knew the four defendants; saw Lonnie and Herman the night of the killing; they came to her house after witness had had supper; that her father had gone to Red Castles' to carry some milk to Mr. Vinson; that they were there when the train ran.

Ike Dodson was next introduced, and testified that he was at Dempsey Williams' when the train went by; it passed when he was leaving; that when he got to his house the boys were there.

At this stage of the trial the trial judge recalled Phillip O'Berry, and made the following statement:

"Phillip, you were a little wrong in some of your statements you made yesterday, and I want to correct you as to this. You said yesterday that if a man spoke a lie, after he was sworn in court, that they would kill him. That is not correct, but if a man swears to a lie, which is called perjury, the punishment is imprisonment in the penitentiary. You seemed ignorant of the crime of murder yesterday. I am going to instruct you as to that. If a man murders another, that is, if he kills another, without legal reasons, and willfully kills him, the punishment is death by hanging. When you are swearing here, you involve, of course, the lives of these men. Now you understand what I have said to you, do you? A. Yes, sir.

"Q. With that information, do you still adhere to your story that these men did the things you said that they did? A. Yes, sir; they did it.

137 Miss.—19.

"Q. You would not tell any lie that would cause these men to be hanged, would you? A. No, sir.

"Q. And what you stated yesterday to this jury is true? A. Yes, sir.

"Q. And you state that, knowing if you tell. a lie, and are convicted of it, you would be sent to the penitentiary for it? A. Yes, sir.

"Q. And do you further know, if a man perjured his soul and told a lie, and caused people to be hung, that in the sight of God he would commit a great crime? A. Yes, sir.

"Q. And, notwithstanding that information, you say that what you told the jury yesterday is the truth? A. Yes, sir.

"Q. You don't care whether you go to the penitentiary or not, do you? A. Yes, sir.

"Q. You care whether or not they hang you? A. Yes, sir.

"Q. You don't want to be hung? A. No, sir.

"Q. You don't care what becomes of you after you die, do you? A. Yes, sir.

"Q. What do you want to do after you die? A. Be put in the ground.

"Q. Outside of that, you don't care?

"Q. Do you want to go to heaven or hell? A. I want to go to heaven.

"Q. You know you will not go there, if you tell a lie on a trial like this? A. No, sir.

"Q. You know you will go to hell, if you did that? A. Yes, sir.

"Q. And you have not done it? A. No, sir."

This examination was conducted out of the absence of the jury, and was not done before the jury.

Dempsey Williams, introduced for the defendant, said he saw Phillip O'Berry the night of the killing; could not really say what time it was; it was early, a little after dark; that he was at his (Phillip's) house when

he came home; that his hand was cut at that time; that he said he was playing at Walter Graham's, and that his little boy shoved him in the mud and he cut his hand; that at that time he had not heard of the killing.

Addison O'Berry was next introduced for the defendant, and said that he learned of the killing the same night, about eight or nine o'clock; that Mr. Brown told him; that he did not tell him the details; that the next evening Mr. Brown told him whoever did the killing had a cut·hand; that he did not know that his boy had a cut hand, and found that out the same evening—Mr. Brown told him—and that he said to the boy "Boy, they are looking for some one who is cut; come here and let me see you;" and· that the boy came up and showed him his hand; that he asked the boy how he cut it, and he said he cut it "over at Mr. Walter Graham's, playing with Coca-Cola bottles;" that he carried the boy over to Mr. Brown's and turned him over to Mr. Brown; that the boy had gone to bed the night of the killing when No. 3 ran; that the boy had a cut hand when he came home, but that he did not pay much attention to it.

Tom Hagan, the next witness introduced, was a brother of Isom Hagan. He heard about the killing the next morning after it happened; saw his brother the night it happened; was at the witness' house. Saw him up at Mimms Dangerfield's the night the killing happened. They reached there about sundown. He (witness), Dave Ellis, and Charley Clay were there, ·saw him until after No. 3 ran; that he was at his house all during that time. None of the other defendants were at this place; that Isom helped the witness to cut some posts down at Mr. Brown's; that they were together until after No. 3 ran. They were playing a game of cards that night called "smut," using flour instead of soot, because soot taken out of the chimney would not take effect; did not look at the clock when No. 3 ran.

Dave Edwards next introduced, testified to the same effect as to Isom's presence at Dangerfield's house; saw Oscar Johnson and Isom Hagan that night; also testified that on Friday preceding the killing he was hunting with Isom Hagan, killing rabbits. Isom killed five, and the witness three or four; that they tied these rabbits around the head with a string and tied them around their waists.

Leola Hagan, the next witness, saw Isom Hagan the night of the killing at Mimms Dangerfield's. She went there before sundown, and Isom came about sundown, and they stayed until after the train ran. They were arguing over a clock when the train ran.

Essie Dangerfield, the next witness, knows the defendants; saw Isom the night the lady was killed; he was at her house; came there about sundown; stayed until something after nine o'clock. They had an argument over a clock. When the train, called No. 3, ran, Dave Edwards said the clock was fast, and started to set it back. They told him to let it stay like it was; that train No. 4 ran in the morning at seven o'clock, and said, "Pay attention to the clock," and see that it was seven o'clock when it ran. The clock was right, and the train was late; that the boys were playing smut with flour; that they were so black that real soot would not take effect; that they had apple dumplings, meat, and biscuit for supper, but that Mary Liza, who lived in the same house, had a rabbit dumpling and biscuit supper.

Mimms Dangerfield, the next witness for defendants, saw Isom Hagan the night the lady was killed. He came to his house about sundown, and stayed until fifteen minutes after nine o'clock; that he had his clock setting on the dresser, and he and Dave were arguing about it; that the persons present were he and his wife, Isom and his wife, Tom and Charley Clay, and May Eliza and Dave Edwards. They were playing smut.

Mary Liza Fulks lives at Smith Station; remembers when the woman was killed; was at Mimms Dangerfield's that night—her house is in the same yard—that, besides herself, Isom Hagan, his brother Tom, and Leola Hagan, Mimms Dangerfield and his wife and Dave Edwards were present; knows all of the defendants; that Isom came to the house that evening just about sundown. After they had eaten supper, went over to Mose Dangerfield's and played smut. The witness, Isom, Tom, and his wife, and Dave Edwards and Charley Clay played smut; that No 3 had passed before they left there; that they stayed there a good while after No. 3 left; had an argument about the clock. Charley Clay testified to the same effect.

Marvin Thurston knows Oscar Johnson and Isom Hagan and Herman Williams and Lonnie Hunter; saw Lonnie Hunter, about one-half hour by sun the day of the killing, coming out of the bottom with a load of hay, with Mr. Kirkland. He was hunting with Isom Hagan on Friday before the killing, and killed four rabbits that day, and Isom killed 3; that they carried them around their waists, tied with a string; that blood from the rabbits got on their overalls; that both he and Isom got blood on their clothes.

Nathaniel Thurston knows all of the defendants; saw Hunter and Williams the day of the killing; saw Lonnie Hunter the same evening, just before sundown, untying hay in the lot; went hunting with Isom Hagan Thursday and Friday before the woman's death; killed three rabbits Friday; Isom killed some (do not know the number); had these rabbits tied around his waist; they got blood on their overalls; that his own clothes had been washed.

Jim Daniels, next introduced, testified that he knows Oscar Johnson and saw him the day before the woman was killed that night; did not see Oscar that night; went up to the house that night between six and seven,

and they had gone to bed. His wife was with him; does not know whether Oscar was there or not. Oscar's wife did the talking.

Jennetta Chapman, the next witness, was living with Oscar Johnson at the time of the killing; was living with him the night of the killing; went hunting that evening; came back about four o'clock; they were about a quarter of a mile from where the killing took place; saw Phillip O'Berry the evening before the killing at Smith Station. She and Lillie Johnson came on home. When they got home, Oscar was dressing a rabbit, about four o'clock; did not leave there at all that night; witness went to bed about ten o'clock. Dave Edwards came there and Lillie called them to supper, and Lillie and Dave Edwards sat down and went to talking, and when they got through Dave left. Oscar had gone to bed about seven o'clock; said he was sick. Jim Daniels came there and called that night. Lillie Johnson, wife of Oscar Johnson, testified to the same effect.

Lonnie Hunter testified, in his own behalf, that he went to the field after twelve o'clock and plowed that evening; came out when the sun was about one-half hour high; came by Mr. Archie Kirkland's, got through his work, and went to Mr. Kirkland's house to make a fire and get in the wood, and then played the graphophone, while Mr. and Mrs. Kirkland were in the kitchen. After Mr. and Mrs. Kirkland had eaten supper, he and Herman were called to supper. It was late; it was after seven o'clock when they left the house. They went from there to Alex Castles' house, about one-fourth of a mile away; did not stay there long; passed Dodson's house, met Ike Dodson, all turned around, and went back to Dodson's. He corroborates the other witnesses as to his whereabouts from then on.

Homer Williams testifies to the same effect. Likewise, Isom Hagan and Oscar Johnson testified in accordance with their respective witnesses as to their whereabouts.

Twelve witnesses, introduced by the defendant, testified that Phillip O'Berry has a bad reputation for truth and veracity in the community in which he lives, and that they would not believe him on oath. Among the witnesses is his father and his preacher. Not a single witness testified that he was worthy of belief or had a good reputation for truth and veracity. When the evidence was about closed, the state asked that the case be held open until the following morning, until they could obtain Dr. Stingily and the result of his examination of the blood stains on the overalls of Isom Hagan. The following morning the state simply announced it had closed, when defendant introduced Dr. Stingily, who had made the scientific test for the determination of whether the blood stains were human or animal blood, and he said that he could not say it was human blood.

I have set out in great detail the evidence, because one of the assignments of error is that the evidence is insufficient, and that this assignment will be determinative of the case.

ETHRIDGE, J., (after stating the facts as above) delivered the opinion of the court.

I will take up the several assignments of error and briefly discuss them.

The first assignment is to the action of the court in removing S. C. Broom as attorney for Phillip O'Berry. Prior to the removal, said Broom had moved a severance as to O'Berry and a joint trial as to the other defendants. Ordinarily no one may complain of the action of the court in this respect, except the principal defendant, whose rights are affected. The privilege of testifying or not testifying is the privilege of the defendant, and ordinarily codefendants cannot complain of any action in reference thereto, and Phillip O'Berry has not appealed, and his case is not before us. No facts are set forth in the record from which we could deduce that

facts were learned, by reason of the relation of attorney and client between Broom and all of the defendants, that might prejudice the case of the appellant, and it might be that special circumstances could show prejudice, but such is not the record before us. Ordinarily, persons indicted for a capital felony jointly with others should, or at least it would be proper to, have separate counsel, as their defenses might conflict one with the other, and we are unable to say that the court could not, in a proper case, do what was here done. In our judgment, there is no merit in this assignment in this record.

The next assignment as to the competency of Phillip O'Berry as a witness. The examination set out in the statement of facts shows that Phillip had no proper conception of the existence of a state of rewards and punishments for good and evil conduct, and that he knew nothing of the legal consequences following perjury, and at common law he would not have been a competent witness. However, we have a statute which provides that religious belief or the want of it does not affect the competence of the witness, and this court, in the case of *Peters* v. *State,* 106 Miss. 333, 63 So. 666, held competent a witness, under the statute, who did not have the common-law qualification. Section 1919 of the Code of 1906 (section 1579, Hemingway's Code), is referred to in this opinion, and the evidence of a child of tender years there held admissible. To the same effect is *Trim* v. *State* (Miss.), 33 So. 718, not officially reported. In this last case the witness was a child of five years of age.

While Phillip O'Berry is a person of very low intelligence and understanding, under these cases he would be a competent witness, and his want of mental capacity to understand the results of false swearing and lack of knowledge as to the consequences of good and evil conduct go to his credibility only.

The defendant objected to the introduction of the overalls until, by a proper test, it should be scientifically determined whether the blood on the garment was human blood or rabbit blood; it appearing that at the time of the arrest Isom Hagan stated to the officer that the overalls were his overalls, and that the blood thereon was rabbit blood. We do not think it was error to admit the overalls in evidence. The state is not compelled, in all cases, to make a test scientifically to determine whether the bloodstained garments are stained with human blood or animal blood. Whenever such test can be made, it ought to be done, but it is a test that is not easily made, and competent persons to make it are not always available.

The defendant objected to a minute description of the scene and the body at the place of the homicide, insisting that no question was involved as to the character of the crime committed, but the only question was as to the connection of the defendants with it. A great deal of unnecessary testimony was introduced, bearing on the details of the tragedy under the peculiar facts of this case, but, as the state had to begin at the scene of the homicide, and trace out the causes of the murder and the connection of the persons who did it, and must establish murder, regardless of any evidence from the defendants, we are unable to say that it was reversible error to introduce this evidence.

It is also insisted that the evidence of Phillip O'Berry is uncorroborated, and that he is an accomplice, and that his evidence alone is insufficient to sustain the verdict. It has been held in this state, in a number of cases, that the testimony of an accomplice, if a credible witness, is sufficient to sustain a conviction. However, the testimony of an accomplice has always been considered as being suspicious and untrustworthy, and that it ought to be scrutinized very carefully and weighed fully before a conviction is arrived at. In *Keithler's Case,* 10 Smedes & M. 192, the court said:

"The testimony of an accomplice should be weighed with great jealousy and distrust by a jury, but it is impossible to say, as a question of law, that he should not be believed. The jury are to determine that from his manner, his consistency, and other attending circumstances. They are to judge how far his testimony has been corroborated, or they may believe him if they choose without corroboration."

In *Fitzcox* v. *State,* 52 Miss. 926, the court quoted the above language with approval, and said:

"This view has been accepted as the rule in this state, and the language of the court in that case has, in our courts, constituted the basis of instructions in like cases since that time. Hence the practice with us is uniform and may be considered as established."

And the same case quotes from Phillips on Evidence as follows:

"The sum of the argument as well as the rule, is thus stated: . . . 'Since accomplices are competent witnesses, it appears to follow as a necessary consequence that, if their testimony is believed by the jury, a prisoner may be legally convicted upon it, though it be unconfirmed by any other evidence. It is the peculiar province of the jury to determine upon the degree of credit to be attached to any competent evidence submitted to their consideration, and it has accordingly been laid down in many cases as a settled rule that a conviction obtained upon the unsupported testimony of an accomplice is strictly legal."

In *George* v. *State,* 39 Miss. at page 570, 2. Morris, State Cases, 1404, the court said:

"Excluding the testimony of the witness Josephine, it is very certain that the facts proved by all the other witnesses do not, beyond a reasonable doubt, establish the guilt of the plaintiff in error, but it is equally certain that, giving full credit to her testimony, the proofs were altogether sufficient to warrant the verdict of the jury. There was a conflict between the testimony of the wit-

ness Eliza, a witness examined for the defense, and that of Josephine, and it is manifest that, if the jury had given full credit to the former, the result of their deliberations might have been very different. But in such a case —that is, where there is a conflict in the evidence—it is the peculiar province of the jury to decide upon the credibility of the respective witnesses, and to believe the statements of those whom they judge entitled to credit. We are not prepared to say, under all of the circumstances proved by the testimony, that, according to the rules of law, the jury were not authorized to disbelieve the statements of the witness Eliza, and to credit the testimony of Josephine. . . .

"It is possible that the witness Josephine, in delivering her testimony, may have been influenced by the hope or expectation that, by procuring the conviction of the plaintiff in error, she might escape the consequences of her own crime. But of this fact, as well as all of the circumstances in proof before them, the jury enjoyed a much better opportunity of forming a correct judgment than we possess, who can only look at the transaction through the medium of a record. They were clearly and fully instructed as to the law and their duties in reference to the testimony of the witness Josephine, and having, after a careful and dispassionate examination of the whole evidence, as we must suppose, given credit to her testimony, and rendered their verdict accordingly, we are not authorized to set it aside.'

Again, in *Wilson* v. *State,* 71 Miss. at page 884, 16 So. 304, Chief Justice Campbell, delivering the opinion of this court, said:

"The testimony in this case is very satisfactory as a support for the verdict. The convict and accomplice, Wall, is corroborated in his evidence by testimony tending strongly to convict Tom Wilson. Were this not the case, the jury might have convicted on the uncorroborated testimony of the accomplice, as has been often held. . . . The testimony of an accomplice is from

a suspicious source. It is to be viewed with caution and carefully scrutinized, because of its polluted source; but, being competent and admitted, it is to perform its office, and, if it secures credit notwithstanding its source, it is to be acted on; if it is believed to be untrue, it is to be disregarded, just as any other testimony which does not command the assent of the mind.'

These cases show that ordinarily the evidence of an accomplice may be sufficient to sustain a conviction. They involve cases, however, where the witnesses were not successfully impeached as being totally unworthy of belief.

In the present case the state's witness not only is shown to be utterly unworthy of belief, but he is also shown to have no very high conception of right and wrong, a very low and limited knowledge of the limits of right and wrong, and of the consequences that follow. Our court has, however, passed upon cases in which witnesses, who were not worthy of credit, testified directly as eyewitnesses to facts which, if true, would make a case of murder and warrant a conviction, and have refused, in some instances, to uphold convictions based upon testimony of such unworthy witnesses. The case of *Sykes* v. *State,* 92 Miss. 247, 45 So. 838, and *Sykes* v. *State,* 89 Miss. 766, 42 So. 875, is one of the cases. The facts necessary to be understood in reference to this case are set out in the 89th Mississippi Report, and are as follows:

"Sykes, a negro, the appellant, was indicted and tried for the murder of another negro, George McIntosh, and was convicted and sentenced to suffer death. From the conviction and sentence he appealed to the supreme court. The decapitated body of the dead man, partially buried, was discovered a short distance from his home, and his head found in a nearby pool of water. The appellant, Sykes, and Martha McIntosh, the widow of the deceased, were severally indicted for the crime. The widow at first pleaded not guilty, but subsequently withdrew the plea and entered a plea of guilty of being an

accessory after the fact to the murder, and was held, pending sentence, at the time of the trial of the appellant. She was the principal witness for the state on appellant's trial, and testified that he, having for some time been seeking to ingratiate himself into her affections and alienate her from her husband, entered the dwelling house at night where she and decedent were sleeping, killed him with an ax; and compelled her to aid in dragging the corpse away; that he decapitated it and hid the head and body in different places. The state's other testimony was merely circumstantial. The appellant, the only witness in his behalf, denied knowledge of the killing.

"During the argument of the case before the jury, an attorney for the state, employed to assist the district attorney, said: 'Gentlemen of the jury, if you turn this prisoner loose, he might be guilty of perpetrating his lust upon some of the white women of the country. I am satisfied that his motive for committing this crime was because he was lusting after Martha McIntosh, the wife of George McIntosh. You ought to convict him, because he might rape some of the white women of the country.' The appellant's counsel objected to the statements of the attorney to the jury, and the same were excluded. Thereupon the attorney further remarked to the jury, in resuming his argument: 'Yes, gentlemen of the jury, I have no objection to my remarks being ruled out, but you know they are facts.' The remarks before the jury, above quoted, were assigned as error."

The first conviction was reversed on account of certain remarks made by the district attorney; the court in that case not passing on the sufficiency of the evidence. The cause was remanded and retried on the same evidence, and a second conviction secured, which the court reversed because of the insufficiency of the evidence. The court said:

"This is the second appearance of this case in this court. We think it was error in the circuit court not to

have required the jury to clear up their manifestly cloudy verdict but we would not be willing to reverse for this error alone. The ground on which we prefer to rest out ruling is that the testimony of the woman, on whose testimony conviction was manifestly had, is utterly unworthy of belief. No conviction should be allowed to stand on testimony of this character.''

This was a case where the state's witness claimed to be an eyewitness, but on previous occasions she had testified directly contrary to her testimony in these trials.

*Dill* v. *State* (Miss.), 38 So. 37, is another case in which the court held that an eyewitness, one who claimed to be an eyewitness, testifying directly as to the guilt of the accused, was contradicted by the overwhelming weight of the evidence, and her testimony was set aside as being insufficient. The facts in that case are as follows:

''On the trial the evidence was in substance as follows: Deceased lived with his father about ten miles south of Columbus, in Lowndes county, and on Monday morning of July 11, 1904, about half after eight o'clock, he left home on horseback to go to Columbus. Wade Witherspoon, for the state, testified that on Tuesday morning, July 12, 1904, he found the body of deceased in a thicket of woods near a creek, about two hundred yards from the public road, and about a half mile from his home, and a pistol was lying near the body. W. E. Cox testified that he saw the body of deceased where it was found, and there were two bullet wounds in it, one where the ball entered, and the other where it came out of the body, and that a pistol was lying near the body. Catherine Newman testified that, on the morning of the killing, a big black man came by her house and asked which way deceased went, and he looked like defendant; but she could not say positively that it was defendant, as she had never seen him before. Missie Jennings, a negro woman, testified that she is the wife of Shed Jennings, who was in jail, charged with the same crime; that deceased was killed in about a quarter of a mile of her

house; that she was on her way to get her cows that morning, and met deceased, and he asked her to meet him over there in the bushes, which she agreed to do, and went there, and, while she and deceased were in the act of illicit intercourse, defendant and her husband, Shed Jennings, came up, and defendant shot deceased with her husband's rifle, and defendant then held deceased while her husband struck him over the head with the rifle, that after the killing she went on home, and appellant came to her house and asked her what her name was, and she told him, and that she asked him his name, and he told her, and told her who he was related to in the neighborhood.

"For defendant, Simp Thompson and his wife testified that defendant spent 'Sunday night before the killing at their house, about four miles south of the scene of the killing, and left their house late that morning on horseback, with Woodley Williams, to go to Mr. Bryant's store. Woodley Williams testified that he and defendant left Simp Thompson's house late Monday morning, on horseback, to go to Mr. Bryant's store, and they stopped at Franklin's quarters twenty-five or thirty minutes, talking to some colored preachers, John Moore and Tom Fell, and they then rode on to the store about a mile and a half away, and arrived there between eleven and twelve o'clock, and defendant was with him all the time until they got there, where he left defendant and went back. John Moore and Tom Fell both testified that they talked with defendant at Franklin's quarters that morning, and Woodley Williams was with him; that defendant and Williams got there about half after ten o'clock, and stayed there about thirty minutes, and went in the direction of Bryant's store. Felix Wilson testified that he rode with defendant and Williams to Franklin's quarters on the morning of the killing, and they stopped there and talked with Moore and Fell, and they left there, and defendant did not have a gun. Taylor Harris, who cooked for Mr. Bryant at his

store, testified that defendant got to the store about eleven o'clock, or after, on the day of the killing, and that defendant stayed at his house that night. Bill Gandy testified that defendant ate dinner at his house the same day, and went to a nearby church to a funeral in the evening. Shed Jennings testified that he never saw defendant until he was put in jail in Columbus, charged with the crime; that he did not see him the day deceased was killed. Mattie Crump testified that she lived in Columbus, and defendant ate dinner at her house on Tuesday after the killing, and Lewis Dill testified that defendant spent Tuesday night at his house, and left Columbus the next day for Alabama, where he lived. Defendant testified that he did not know deceased, and did not know and had never seen Missie Jennings, Catherine Newman, nor Shed Jennings, until he was placed in jail at Columbus. Defendant's motion for a new trial was overruled, and he appeals.''

The court held that this evidence was insufficient to sustain a judgment of conviction.

It is insisted by the attorney general that the testimony of witness Phillip O'Berry has been corroborated in many respects by the circumstances and facts in the case, and that his testimony, so supported, is sufficient to authorize the jury to find all of the appellants guilty beyond all reasonable doubt. The evidence, outside of O'Berry's testimony, is inconclusive and far below the standard required for conviction in circumstantial cases. The testimony of Phillip O'Berry is that, when he went into the store, Isom Hagan had hold of the deceased around the waist, with her hands pinioned behind her, and that Herman Williams was in front of her cutting her with a knife, and that Lonnie Hunter was beating her with his fist—to use his language, "all over"—that she had been stabbed a number of times, and was bleeding; that Herman was cutting her throat. Yet when these parties, Lonnie Hunter and Herman Williams, were arrested, there was no blood upon their clothing; yet the

blood spurted all about in the store, and it is difficult to
see how it would be possible for these persons to have
been in the position O'Berry claims they were and not
be spattered with blood.   The testimony of  Phillip
O'Berry is that this cutting and scuffling took place be-
fore he (O'Berry) struck the deceased with a bottle over
the head; yet he does not testify that any outcry or
screams were made, or any call for help, and it appears
highly probable that, if the deceased and the defendants
had been in the position which he testified they were, she
would have cried out, because, according to his state-
ment, the person holding her did not have his hands over
her mouth, and the person who cut her with a knife had
stabbed her a number of times prior to  cutting her
throat.   It seems more probable that the blow on the
head may have been first inflicted.

The fact that the dogs trailed some person from the
store to the place where Herman Williams and Lonnie
Hunter were found is far from demonstrative proof that
they were at the scene of the homicide at the time it was
committed.   The dogs had failed to trail some of the de-
fendants; that is to say, the dogs, had not  trailed the
witness Phillip O'Berry, Isom Hagan, and Oscar John-
son, and the trailing did not correspond with his version
of how he traveled from the scene of the homicide to
his home.   At best, the evidence furnished by blood-
hounds is weak and unsatisfactory.   It is true that many
people have a superstitious reverence for bloodhound
testimony, but in its very nature it is weak and unsatis
factory, even where the hounds make no mistake and
lose no trails.   The evidence shows in the present case
that they utterly failed as to three of the alleged par-
ticipants in the homicide.   They trailed two different
routes from the scene of the homicide to the house where
Lonnie Hunter and Herman  Williams  were  sleeping.
One of the witnesses said, with reference to one of these
tracks, that the track appeared to be older than the other
one which was trailed by a different route to the same

place. The evidence does not show how many persons visited the store during the preceding twenty-four hours; nor does it show that no person had left the store from the end of the gallery where the dogs were started. Of course, the dogs could not testify as to when the track was made which they trailed. The evidence does not show how long such dogs could trail tracks after they were made under the conditions then existing.

Phillip O'Berry is contradicted by a large number of witnesses, who testified as to the whereabouts of the several appellants on the night of the alleged killing. None of these witnesses were impeached as being unworthy of belief. Their evidence is consistent and not improbable on its face. There were three separate sets of witnesses, proving as many distinct alibis, and, unless all of these witnesses were falsifying, Phillip O'Berry's testimony could not be true. The presumption is that an unimpeached witness is credible and worthy of belief; that he is honest and intends to speak the truth. Of course, where two witnesses, whose credibility has not been impeached, and who have not been otherwise shown to be unworthy of belief, testify to conflicting facts, the jury must judge as to who is telling the truth, and the personal appearance and general demeanor of the witnesses, and the jurors' knowledge of their general standing in the community in which they live, are considered as determining the probabilities of the truth.

The policy of the law is that it is better for the guilty to escape punishment that for the innocent to suffer punishment, and it is the settled policy of the state to require proof of guilt beyond reasonable doubt. It would seem an incredible thing to say a witness, who has such limited knowledge, and such a limited appreciation of right and wrong, and of the consequences following wrong conduct, and who is shown to be utterly untrustworthy as a general proposition, could, when pitted against a large number of witnesses whose credibility had not been impeached, and who apparently had no

motive to testify falsely, so overcome such preponderant witnesses as to remove all reasonable doubt.

The rule in circumstantial cases is even stronger than the doctrine of reasonable doubt, and requires the exclusive of every reasonable hypothesis other than that of guilt. See *Hogan* v. *State,* 127 Miss. 407, 90 So. 99·; *Taylor* v. *State,* 108 Miss. 18, 66 So. 321; *John's Case,* 24 · Miss. 569; *Morris' State Cases,* 608; *Caleb's Case,* 39 Miss. 721; *Morris' State Cases,* 1490; *Algheri* v. *State,* 25 Miss. 584; *Morris'State Cases,* 658.

We are therefore of the opinion, that the evidence is insufficient to sustain the conviction. The trial followed shortly after the commission of the crime, and it may be that the evidence on a new trial by the state may be materially strengthened; at least, all the facts, whatever they may be, may be more fully developed. The judgment of the court below will therefore be reversed and remanded for a new trial.

*Reversed and remanded.*

SMITH, C. J. (dissenting).

I am of the opinion that the judgment of the court below should be affirmed.

I will assume, for the sake of the argument, that the verdict rests on the unsupported testimony of an accomplice, but it is "the province of the jury to determine what credit to give to the testimony of an accomplice, from his manner and general appearance upon the stand, and all other surrounding and attending circumstances, and it is the jury's privilege, if they see proper, to believe him without corroboration." *Osborne* v. *State,* 99 Miss. 410, 55 So. 52.

It is true that the testimony of an accomplice should be weighed by the jury with care and caution, but so should the testimony of all other witnesses. The only difference between the duty of the jury to weigh the evidence of an accomplice with care and caution and to so weigh the evidence of other witnesses is one of degree

only, of which the jury alone is the judge. But it is said that "the witness not only is shown to be utterly unworthy of belief, but he is also shown to have no very high conception of right and wrong, a very low and limited knowledge of the limits of right and wrong, and of the consequences that follow;' but these facts, if such they be, do not affect his competency, but go to his credibility only, as is admitted in the majority opinion, wherein it is said that:

"While Phillip O'Berry is a person of very low intelligence and understanding, under these cases he would be a competent witness, and his want of mental capacity to understand the results of false swearing and lack of knowledge as to the consequences of good and evil conduct go to his credibility only."

It is true that the witness was without education and of limited knowledge, but his answers to the questions as to what he saw and heard when Mrs. Mardis was killed, which are too lengthy to be here set out, demonstrate that his ability to observe, remember, and narrate matters coming under his observation is about that of the average uneducated negro of his age. If he was a competent witness, and the court holds that he was, his credibility was for the determination of the jury, "the sole and exclusive judges of the weight of the evidence." *Miller* v. *State* (Miss.), 35 So. 690, and whose province it is "to determine the result of conflicting testimony." *Alexander* v. *State* (Miss.), 21 So. 923.

Of course, I recognize the rule that, where a verdict rests on the unsupported evidence of a witness whose conflicting statements demonstrate that he is unworthy of belief (*Sykes* v. *State,* 92 Miss. 247, 45 So. 838), or whose testimony sets forth a discredited and improbable story which is in conflict with the other evidence in the case (*Dill* v. *State* [Miss.], 38 So. 37; *Hardy* v. *Masonic Benefit Association,* 103 Miss. 108, 60 So. 48), the court may set aside a verdict resting thereon and grant the defendant a new trial, but such is not the case here. The

appellants are either guilty; or the state's witness was lying, and on the evidence it was for the jury to say which is the case.

HOLDEN, J. (dissenting).

I agree with the dissenting views expressed above by Chief Justice SMITH, for he has merely announced the rule followed by this court from time immemorial, and is applicable in the case at bar.

And while it is not necessary that the testimony of an accomplice shall be corroborated before a conviction will be allowed to stand upon it alone, I am convinced, after a thorough consideration of the evidence in this case, that the testimony of the witness O'Berry is corroborated by other physical facts and circumstances in the case, and the jury was well warranted in believing his story and returning a verdict of guilty.

The testimony of O'Berry is reasonable and positive and uncontradicted, except by the testimony given for the appellants, which the jury had the right to believe or disbelieve. The jury saw and heard O'Berry testify; his story was reasonable, and his intelligence was sufficient to establish his competency as a witness, and I see no good reason for our holding that the jury was not justified in believing his straightforward narrative as to how and who committed the murder.

I shall not take the time to set out the evidence, nor call attention to the favorable phases of it in this record, which tended to show that the facts and circumstances corroborated the testimony of O'Berry, but shall consider it enough to say that the record completely satisfies me in this regard. The judgment of the lower court ought to be affirmed.