PEGRAM *v.* STATE

No. 40160          October 15, 1956          89 So. 2d 846

*A. M. Edwards, Jr.,* West Point; *W. H. Anderson,* Ripley, for appellant.

*J. R. Griffin,* Asst. Atty. Gen., Jackson, for appellee.

Hall, J.

This is the second appearance of this case in this Court. On the former appeal appellant had been convicted of armed robbery and sentenced to a term of twenty-

five years in the state penitentiary. For various errors committed in the trial of the case we reversed the judgment of the circuit court and remanded the case for another trial. 78 So. 2d 153, not yet reported in the State Reports.

On the second trial of this case appellant was again convicted and sentenced to serve a term of twenty-five years in the state penitentiary. The record shows without substantial dispute that a beer joint owned by W. E. Farr and located in Clay County near the Webster County line, and a distance of about thirty or thirty-five miles from the City of West Point, was robbed at about 12:30 or 1:00 o'clock A.M. on the morning of June 2, 1953. The place had closed for the night and was in charge of a Negro named Andy Rimmer, who slept in a room in the rear of the place. There was a knock at the front door which awakened him, and he went to answer the knock and saw two men who at the point of a pistol forced their way into the place. They took Andy's pistol from under the pillow where he was sleeping and securely taped his legs together with wide adhesive tape and also taped his eyes and his mouth so that he could make no outcry. They took a quantity of money from the cash register and also took all of the personal money which Andy had and required him to sit down on the cot where he had been sleeping. They then backed a truck up near the front door and proceeded to load the truck with approximately 300 cases of Budweiser beer, which necessarily required some time. Andy did not see all of the men engaged in the robbery. He did see the first two who came to the door and whose faces were covered, but he estimated from the noise that occurred in the carrying out of the beer and loading it on the truck that four men were engaged in the robbery. During the course of the robbery, while the beer was being loaded, an automobile drove up and the occupants saw two men, one being at the front of the truck and the other at the rear, and

they both had their faces covered. One of them ordered the occupants of the car to get out but instead they drove away, and one of the men fired a shotgun. It was shown, practically without dispute, that the truck in question was the property of W. R. Scott of Columbus, who was also indicted for his connection in the robbery.

The only witness who testified that the appellant participated in this robbery was one Ernest Rose, who testified that he came from Texas to Columbus in May 1953 at the request of Walter Scott, who is the same person as W. R. Scott above mentioned. He first lived at a tourist court across the river bridge at Columbus. He said that on .Saturday, May 30, 1953, he first met the appellant at his tourist cabin; that he and Robert Ballow were already at the cabin and that Walter Scott came there and brought the appellant with him, and that the appellant planned the robbery on this first meeting. He testified that after the robbery they stored the beer at a farm house near the Alabama line and that the appellant arranged for sale of it later. He said that the beer was sold in 100 case lots and that the first sale was made to Hood Luther in Pontotoc County and that he was present on this occasion. He further testified that on the following Saturday, June 6, a Bill Wilson wired $300 from Tupelo to Scott at Columbus and that Scott divided this money with him the following morning.

It was shown without dispute that the shotgun which was fired on the occasion of the robbery was the property of Scott, and it was further shown by a representative of the Federal Bureau of Investigation laboratories in Washington that the shell ejected therefrom and left on the ground at the scene of the robbery was fired from Scott's gun. Rose testified that he did not cover his face at any time during the robbery, which is in direct conflict with the testimony of Andy Rimmer. He further testified that he held the shotgun on Rimmer, but Rimmer said that he did not see a shotgun and that he only

saw a pistol. There are numerous other conflicts in the evidence and in Rose's version at the first trial and at the second trial. A few weeks after this robbery another similar robbery was committed in Monroe County, in which it is admitted that Pegram did not participate. Prior to this trial Rose had been convicted in Monroe County and sentenced to a life term in the penitentiary, which was later reduced to a term of twenty-five years on the last day of the Monroe County court. He also entered a plea of guilty to the indictment in this case, but has never yet been sentenced and at the time of this trial he was brought from the penitentiary at Parchman to West Point to testify as a witness. Rose is thirty-one years of age and, with the exception of two years, has spent his entire life in the penitentiary since he was age fifteen for various and sundry crimes committed over the country.

A highway patrolman testified that sometime after the robbery he apprehended an automobile in which Ernest Rose, Robert Ballow, Mack Woods and Walter Scott were riding, and he found Andy Rimmer's pistol in the car, but the appellant was not present on that occasion. It also appears that Scott's shotgun was recovered from the home of Ernest Rose by virtue of a search warrant.

It is significant to note that the agent of the Western Union Telegraph Company at Tupelo, with whom was placed the $300 for wiring to W. R. Scott at Columbus, testified about the incident and identified her record of the transaction and, even though the appellant was sitting in the courtroom at the time, she made no effort to identify him as the person who had wired the money, and there is not one word of evidence in the whole record from any witness except Ernest Rose which tends in any way to implicate the appellant in this robbery.

The ticket agent for the Southern Airways at the Tupelo Airport testified with reference to the record of the Southern Airways which shows that a Mr. Pe-

gram, without giving any initials, appears on the manifest list as a passenger from Tupelo to Memphis on May 30, 1953, leaving Tupelo at 8:15 P.M. This agent wrote up the manifest list and signed it and he testified that the Mr. Pegram shown on the list is the defendant in this case, and that he personally sold to the defendant the ticket to Memphis on May 30, 1953. The manifest list of the Southern Airways also shows that on June 2, 1953, Bill Pegram bought a ticket and was a passenger on the plane from Memphis to Columbus, leaving Memphis at 1:00 P.M. Tuesday, June 2, 1953.

The appellant's wife testified that they have been married over eighteen years and live in Memphis and have one child, a daughter, of the age of fifteen years. She said that the appellant formerly owned a stock car racetrack in Tupelo and later was employed in Columbus; that at the time of this robbery the appellant did not own an automobile and came home every weekend, usually flying by plane. She further said that he flew into Memphis on the night of May 30, 1953, which was a Saturday night, and that she and her daughter and a brother-in-law who had an automobile, met him at the airport between 8:00 and 9:00 P.M., and that the appellant spent that night at home and was at home on Sunday morning. She further said that the brother-in-law, whose name was Bob Comstock, and his wife, lived in the same house with them, and were preparing to move to Texas the following week and that she and the appellant decided to try to find a smaller apartment so as to avoid renting the entire house in which they had been living with the Comstocks; and that they spent most of Sunday afternoon looking for a smaller apartment. She further testified that the appellant spent the night with her Sunday night and went down town Monday morning and returned home in the early afternoon of Monday, June 1, 1953. She said that on Monday night she and her husband and daughter got a taxicab and picked up Mr. Taft

Moody in front of the Gayoso Hotel, where he lived, at about 7:30 P.M. and they all went to Sam's Spaghetti House for dinner and about 9:00 P.M. went to Loew's State Theater and got out about 11:30 or 11:45 P.M. She said that Moody went to his hotel and she and her husband and daughter got a taxicab and arrived home about 11:30 or 12:00 o'clock that night and that the appellant spent the night with her and was there the next morning, Tuesday, June 2, 1953, and had breakfast with them and soon after breakfast he went back to town. Her brother-in-law was moving to Texas that day, June 2, 1953, and she went to town and changed over the gas, water and light accounts, making a meter deposit thereon on that day, which was introduced in evidence and bears the date of June 2, 1953. She also said that the defendant was carried to the airport by Junior Tinkle at around noon. She further said that their daughter wanted to go to Texas for a visit with her uncle and aunt who were moving out there, but that school had not closed and would not close until the end of that week and that she and her husband would not let the daughter go and compelled her to stay until the school closed.

T. G. Tinkle, Jr., a nephew of the defendant, age 34, testified that on the morning of June 1, 1953, he carried the appellant to the office of the F.B.I. in the Sterick Building in Memphis for an interview with one of the agents and waited for him and was with him that day until about 6:30 P.M. He further testified that the next morning he carried the appellant back for a further conference with the agent of the Federal Bureau of Investigation and then he waited again and carried him by his home and on to the airport, and that this was on Tuesday, June 2, 1953, and he saw appellant get on the plane and waited until it left. The agent of the Federal Bureau of Investigation with whom the appellant talked on Monday, June 1, and Tuesday, June 2, testified on the former trial

of this case but did not testify on this trial, and he verified the same story which Tinkle told.

Mr. Neil Conder of Henderson, Tennessee, testified that he has served two terms as sheriff of Chester County and was deputy sheriff for four years. That he is interested in stock car races and that on May 29, 1953, in company with Lloyd Mays, he drove from Henderson, Tennessee, to Indianapolis and watched the stock car races at the Indianapolis Speedway on May 30th and May 31st, 1953, and they left Indianapolis on the morning of June 1, and drove back and arrived in Memphis about 9:00 or 10:00 P.M. that day. He was not acquainted with the appellant but he was interested in having a racing motor fixed up for his personal automobile and Lloyd Mays told him about Pegram's ability to build racing motors. Conder said that he went to Pegram's home after his arrival in Memphis to see him but no one was at home and he went back to town and to the sheriff's office and he and the sheriff in Memphis talked together for quite a while and that he went back to Pegram's home and met him about midnight on June 1, 1953, and discussed with him the question of getting Pegram to build a motor for him. He said that Pegram told him that he would not be able to do the work but that he told him what to do and where to get everything he needed.

The appellant's daughter testified that she went to Fairview Junior High School in Memphis in 1953 and that school dismissed either on June 5th or June 6th. She said that Mr. and Mrs. Comstock lived in the house with them and they left, moving to Texas, either on the 2nd or 3rd of the month. She verified the fact that her father and mother were not certain whether they would keep the house after the Comstocks left and that on the previous Sunday morning she went to church and Sunday School and that that afternoon she and her father and mother went out looking for a house or an apart-

ment, and that they went to a neighborhood picture show that night and that her father spent the night at home and was at home the next morning. She said that on Monday night they got in a taxicab and went by the hotel and picked up Mr. Moody and they all went to Sam's Spaghetti House for supper and then went to the last show at the Loew's-State Theater. She said that they saw the picture "Young Bess" starring Stewart Granger and Jean Simmons, and that they took a taxicab home after the show, and that her father spent the night at home and was there the next morning.

The appellant contends that on the testimony in this case he was entitled to a peremptory instruction which was refused by the lower court. In numerous cases we have held that a person may be convicted upon the uncorroborated evidence of an accomplice, but we have also held that where there is strong testimony of an alibi a conviction will not be upheld. Admittedly Rose is a common and habitual criminal and although he entered a plea of guilty to this robbery he has never yet been sentenced. It could well be that he is hoping for clemency in consideration for his turning State's evidence in this case. There are numerous discrepancies between Rose's testimony and that of the other witnesses for the State. He said that in this robbery they not only took about 300 cases of beer but also a tow sack full of whiskey. Andy Rimmer, and Robert Moore who operated the place for Farr but who was not present at the time, both testified that there was no whiskey in the building. Rimmer said that the men who came in the place had their faces covered with hankerchiefs or something similar, and the state witness Thorpe testified to the same effect, but Rose testified that they had nothing over their faces. Rimmer testified that only a pistol was pulled on him. Rose testified that he pointed the shotgun at Rimmer. On the first trial Rose testified that all of the beer was delivered in 100 case lots the same night

of the robbery, but on the second trial he testified that it was stored at a farm house near the Alabama line. On the first trial Rose testified that he was present when Hood Luther paid the appellant for the 100 cases of beer, but on the second trial he testified that he did not see any of the beer paid for. These are some of the conflicts, and, while there were others, we do not think it necessary to point them out. In the case of White v. State, 146 Miss. 815 (819), 112 So. 27, we said: "Putting the case differently somewhat, we have a conviction here based alone on the testimony of an alleged accomplice who is a common thief and a common liar, and, in addition, whose story itself has many of the earmarks of falsehood. We do not think it amounted to any substantial evidence at all. Under the authority of Hunter v. State, 137 Miss. 276, 102 So. 282, and Abele v. State, 138 Miss. 772, 103 So. 370, we think the appellant was entitled to a directed verdict of not guilty."

In the case of Abele v. State, 138 Miss. 772 (781), 103 So. 370, we quoted with approval from Hunter v. State, 137 Miss. 276, 102 So. 282, as follows: " 'Ordinarily a conviction may be had upon the uncorroborated evidence of an accomplice, but, where the accomplice is barely intelligent enough to be a witness, and where his reputation for truth and veracity has been successfully impeached by unimpeached witnesses, and where such evidence is not corroborated sufficiently, and where there is strong testimony of an alibi by numerous witnesses, a conviction on such testimony of such impeached witness will not be upheld.' "

In Creed v. State, 179 Miss. 700 (705), 176 So. 596, we said: "The rule is well settled that, while a conviction may be sustained on the uncorroborated testimony of an accomplice, it is equally well settled that such a conviction should not be upheld where such testimony is improbable, self-contradictory, and unreasonable on its face, and especially where it is impeached by unimpeach-

ed witnesses. Day v. State (Miss.), 7 So. 326; Wright
v. State, 130 Miss. 603, 94 So. 716; Hunter v. State, 137
Miss. 276, 102 So. 282; Abele v. State, 138 Miss. 772, 103
So. 370; White v. State, 146 Miss. 815, 112 So. 27; Mat-
thews v. State, 148 Miss. 696, 114 So. 816; Boutwell v.
State, 165 Miss. 16, 143 So. 479; Harmon v. State, 167
Miss. 527, 142 So. 473; Rutledge v. State, 171 Miss. 311,
157 So. 907; Carter v. State (Miss.), 166 So. 377. * * *
■■ ■ It was said in the case of Conway v. State, 177
Miss. 461, 171 So. 16, 17, that: 'It is rare that a trial, or
an appellate, court is justified in setting up its judgment
against that of the jury on an issue of fact, nevertheless
it should do so in a proper case, and we think this is one
of that character.' ''

■■ ■ We have given careful consideration to the
facts of this case and we have reached the conclusion that
the evidence for the State, based solely upon the testi-
mony of the witness Rose, the alleged accomplice, is so
thoroughly impeached by the appellant's alibi that the
judgment of conviction ought not to stand and that the
appellant was entitled to the peremptory instruction
which he requested.

Reversed and appellant discharged.

*McGehee, C. J.,* and *Lee, Holmes, Arrington* and *Gil-
lespie, JJ.,* concur.

ETHRIDGE, J., concurring in part and dissenting in part.

There is considerable difference between reversing a
conviction and discharging the appellant, and reversing
and remandnig for a new trial on the ground that the con-
viction is against the weight of the evidence. I agree with
the controlling opinion in the reversal of this judgment,
but in my opinion the defendant is not entitled to a per-
emptory instruction either in the trial court or this
Court. For that reason, I would remand the case for a
new trial. There was enough evidence to go to the jury

but, considering the entire record, I am convinced that the conviction is against the weight of the evidence, and that another jury should have the opportunity of passing on the case. My understanding of Judge Roberd's dissenting opinion is that he would affirm the conviction. With that I cannot agree, but would reverse and remand the case for a new trial.

Kyle, J., joins in this opinion.

*Roberds, P. J.,* dissenting.

It is my opinion that the weight of the evidence, the credibility and veracity of the witnesses, and the guilt or innocence of the accused, were all questions to be passed upon by the jurors, who heard the witnesses testify and saw their demeanor on the stand—not questions to be decided by the members of this Court, who had no such opportunity.