368 So.2d 1265 (1979)
Louis JONES
v.
STATE of Mississippi.
No. 50727.
Supreme Court of Mississippi.
March 28, 1979.
John L. Hatcher, Cleveland, for appellant.
A.F. Summer, Atty. Gen., by Carolyn B. Mills, Special Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
SMITH, Presiding Justice, for the Court:
In this case Louis Jones and Clarence Hawkins were indicted jointly for grand larceny in connection with the theft of a tractor. Hawkins entered a plea of guilty, but sentencing was deferred pending the trial of Jones. Jones pled not guilty and was tried in the Circuit Court of Sunflower County, convicted largely upon the testimony of Hawkins, and sentenced to a term of three (3) years imprisonment.
These facts relating to the larceny are undisputed: Hawkins, who lived in Indianola, rented a U-Haul van-type truck. He drove this truck to Cleveland where the tractor, which was the subject of the larceny, was loaded into the van. Hawkins then drove the truck, containing the tractor, to Arkansas. After spending the night at a motel, the next day Hawkins sold the tractor for $7,000.00. In connection with the sale, Hawkins executed an affidavit of ownership and a bill of sale to the purchaser. Hawkins received the purchaser's check for $7,000.00 in payment for the tractor. Afterwards, Hawkins returned to Mississippi and cashed the check.
According to Hawkins, Jones' role in the larceny was as follows: Hawkins had met Jones in January, 1977, and Jones had given him a card with his name and telephone numbers on it. The crime was committed on February 20, 1977. Hawkins testified that he had rented the van-type truck in Indianola because Jones had telephoned him and asked him to do so. He said that he brought the truck to Cleveland and left it on a parking lot near a hospital pursuant to directions given him by Jones in the telephone conversation. According to Hawkins, he had given Jones the keys and, when he again picked up the truck the tractor was in it, presumably placed there by Jones. Jones' further participation, Hawkins said, had consisted in giving him, Hawkins, the blank printed form of bill of sale which Hawkins used in selling the tractor. Hawkins said he gave Jones $4,500.00 of the *1266 $7,000.00 check received by Hawkins and which Hawkins had cashed, keeping only $2,500.00.
Jones emphatically denies having participated in any way in Hawkins' felonious activities. Moreover, the testimony of two witnesses, at least one of whom must be said to have had no interest in the case, placed Jones, at the critical time, at a motel in Cleveland so that he could not have been at the place at which Hawkins' testimony would have required him to be. The identification of Jones by this witness was positive and circumstantial.
There is no substantial or significant corroboration of Hawkins' testimony incriminating Jones. A witness, one Williams, placed on the stand by the State, testified that he lived "out in the country" from Cleveland on a dead end road, and on the night in question, had learned that a van-type truck was in the ditch in front of his house. Williams said that he had not known the driver of the truck, but that a man in a green station wagon had stopped and that he, Williams, had pulled the truck out of the ditch and the man who had arrived in the green station wagon had paid him $10.00. On direct examination he was asked to identify Jones as the driver of the green station wagon and he said that the man in the station wagon had been Jones. Williams testified that the incident had occurred shortly after 10:00 at night, that a "yard light" furnished the only illumination and that it was "pretty dark." He admitted that he had never seen Jones before and only saw him for a few moments on the night in question. He said that the van had not contained a tractor when he saw it, but that he remembered it did not have a "local" tag.
On cross-examination, however, Williams frankly admitted that the officers had taken him on a search specifically to find Jones, taking him to Jones' place of business, to determine if he could identify him as the man in the green station wagon. With this suggestive identification procedure as a background, Williams, on direct examination, undertook to say that Jones had been the man. However, on cross-examination, he admitted, in all candor, that he was not sure of the identification of Jones and described his "identification" of Jones as follows:
"Q... . I believe you stated that you were reasonably sure, or something to that effect, although not absolutely positive.
A. Yes.
Q. That's what you told me?
A. Yes.
Q. That out of all the people you have been shown, that this one came the closest?
A. Yes."
Apart from the above, there was no evidence capable of supplying reasonable corroboration of Hawkins' statements involving Jones in the crime.
The only other items supposedly corroborative of Hawkins consisted of a telephone call from a barbeque place in Indianola to a pizza hut in Cleveland, and another telephone call from Jitney, Jr. in Indianola to Coleman's Barbeque in Cleveland, and testimony regarding some ramps allegedly used by Hawkins. These items were not tied in with Jones with sufficient clarity or certainty as to render them competent and their prejudicial effect far outweighs any probative value they might have had.
The case against Jones, a man of no previous criminal record, rests then upon the testimony of Hawkins, a convicted felon awaiting sentence following his plea of guilty, which is flatly contradicted by Jones and two other witnesses. At every point from beginning to end, where there is corroboration, it was Hawkins himself who acted. His statement that everything he did was in compliance with a request from Jones, a man he had known only two or three weeks, strains credulity. It is noted that the points at which Hawkins said Jones was involved had the virtue, from Hawkins' standpoint, of being such as could not easily be disproved. Every fact capable of being proved, other than by Hawkins' own testimony, showed Hawkins acting alone.
*1267 Among other grounds assigned for reversal, it is contended on behalf of Jones that the trial court erred in denying his request for a new trial which was based upon the ground that the verdict was against the weight of the evidence.
Throughout the history of criminal jurisprudence in Mississippi, the sufficiency of evidence to support a conviction has been reviewed by this Court where there has been (1) a request for peremptory instruction, and (2) a motion has been made for a new trial upon the ground that the guilty verdict was against the weight of the totality of the evidence. A succinct statement of the extent and nature of the review in such cases appears in Roberson v. State, 257 So.2d 505 (Miss. 1977):
We have repeatedly pointed out that the trial judge in passing upon a motion for a directed verdict, or a peremptory instruction, must assume that all the evidence for the State is true, and must assume that all the reasonable inferences that may be drawn from the evidence by the jury of reasonable men, is true, and if, from all the testimony, there is enough in the record to support a verdict, the motion for a peremptory instruction should be overruled. Redwine v. State, 149 Miss. 741, 115 So. 889 (1928).
[2] This rule does not, however, preclude the judge from considering all the testimony for the State and defendant on a motion for a new trial upon the ground that the verdict of the jury is against the weight of the evidence. McLendon v. State, 187 Miss. 247, 191 So. 821 (1939). 257 So.2d at 507.
In reviewing the totality of the evidence in the case now before the Court, it has been pointed out that under the rule in Mississippi, long established and consistently adhered to, the testimony of Hawkins, the convicted accomplice and felon, must be viewed with great caution and suspicion. Where it is uncorroborated, it must also be reasonable, not improbable, self-contradictory or substantially impeached. Thomas v. State, 340 So.2d 1 (Miss. 1976); Black v. State, 336 So.2d 1302 (Miss. 1976); Hutchins v. State, 220 So.2d 276 (Miss. 1969); Cole v. State, 217 Miss. 779, 65 So.2d 262 (1953); Young v. State, 255 So.2d 318 (Miss. 1971); Pegram v. State, 228 Miss. 860, 89 So.2d 846 (1956); Perdue v. State, 199 Miss. 624, 25 So.2d 185 (1946); Lyle v. State, 193 Miss. 102, 8 So.2d 459 (1942); Nichols v. State, 174 Miss. 271, 164 So. 20 (1935).
In Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1, decided June 14, 1978, the United States Supreme Court re-examined the rule which had hitherto existed that where a motion was made for a new trial on the basis of insufficiency of the evidence to support a conviction, the appellate court, upon sustaining the motion, might remand the case for another trial. Burks had been tried in a district court on a charge of having robbed a federally insured bank by using a dangerous weapon. Burks interposed as his defense a claim that he had been insane at the time, placing upon the prosecution the burden of proving his sanity. To meet this burden, the prosecution offered two experts, one of whom testified that Burks was not mentally ill and the other gave an ambiguous answer to the question of whether Burks had been capable of conforming his conduct under the law. All the other testimony offered to prove that Burks had been sane consisted of lay testimony that he had appeared to be capable of functioning normally at the time of the offense. Following his conviction, Burks moved for a new trial upon the ground that the evidence was insufficient to support the verdict. The motion was denied by the district court. The Court of Appeals, however, agreed that the evidence had been insufficient to support the verdict and reversed Burks' conviction. The Court of Appeals, rather than terminating the case against Burks, remanded it to the district court for determination of whether Burks' acquittal should be directed or a new trial ordered. This action by the Court of Appeals was based on a decision by the Fifth Circuit in United States v. Bass, 490 F.2d 846, 852-853 (5th Cir.1974).
In Burks the Supreme Court specified and set forth the narrow issue in the following paragraph:

*1268 The United States has not cross-petitioned for certiorari on the question of whether the Court of Appeals was correct in holding that the Government had failed to meet its burden of proof with respect to the claim of insanity. Accordingly, that issue is not open for review here. Given this posture, we are squarely presented with the question of whether a defendant may be tried a second time when a reviewing court has determined that in a prior trial the evidence was insufficient to sustain the verdict of the jury. [Emphasis added].
437 U.S. at 5, 98 S.Ct. at 2144, 57 L.Ed.2d at 5.
With the issue thus limited and defined, the Supreme Court concluded:
The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials. The Clause does not allow "the State ... to make repeated attempts to convict an individual for an alleged offense," since "the constitutional prohibition against `double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." Green v. United States, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957); see Serfass v. United States, 420 U.S. 377, 387-388, 95 S.Ct. 1055, 1061-1062, 43 L.Ed.2d 265 (1975); United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971).
Nonetheless, as the discussion in Part II, supra, indicates, our past holdings do not appear consistent with what we believe the Double Jeopardy Clause commands. A close re-examination of those precedents, however, persuades us that they have not properly construed the Clause, and accordingly should no longer be followed.
437 U.S. at 11, 98 S.Ct. at 2147, 57 L.Ed.2d at 9.
* * * * * *
In our view it makes no difference that a defendant has sought a new trial as one of his remedies, or even as the sole remedy. It cannot be meaningfully said that a person "waives" his right to a judgment of acquittal by moving for a new trial. See Green v. United States, 355 U.S., at 191-198, 78 S.Ct., at 225-229. Moreover, as Forman, supra [Forman v. United States] 361 U.S. [416], at 425, 80 S.Ct. [481], at 486 [4 L.Ed.2d 412] has indicated, an appellate court is authorized by § 2106 to "go beyond the relief sought" in order to provide that relief which would be "just under the circumstances." Since we hold today that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only "just" remedy available for that court is the direction of a judgment of acquittal. To the extent that our prior decisions suggest that by moving for a new trial, a defendant waives his right to a judgment of acquittal on the basis of evidentiary insufficiency, those cases are overruled.
437 U.S. at 17, 98 S.Ct. at 2150, 57 L.Ed.2d at 13.
It has been suggested that the decision in Burks has curtailed or eliminated entirely the power of an appellate court to remand a criminal case for a new trial based upon the proposition that the totality of the evidence was insufficient to support the conviction. Although the issue actually decided in Burks was extremely narrow and the scope of the decision must be considered as being limited to the issue actually before the court, the language contained in the opinion has raised some doubt as to the power of this Court to follow its former practice, where there has been a motion for a new trial upon the ground that the verdict was against the weight of the evidence, to review the evidence as a whole, and to determine, as a matter of law, that the motion has been well taken and should be sustained, and to remand the case to the lower court for a new trial.
*1269 This case, however, in its material aspects, resembles Pegram v. State, 228 Miss. 860, 89 So.2d 846 (1956). In Pegram, Pegram had been convicted largely upon the uncorroborated testimony of an accomplice. The court reviewed the testimony in some detail and reached the conclusion that, based upon the totality of the circumstances and the probative value of all the evidence in the case, including the testimony of the accomplice when viewed with suspicion and caution, the verdict of guilty had been against the weight of the evidence and that Pegram, rather than being awarded a new trial, should be discharged, although two of the justices, while concurring in the reversal of the case, were of the opinion that the case should have been remanded for a new trial.
In Pegram, this Court said:
In numerous cases we have held that a person may be convicted upon the uncorroborated evidence of an accomplice, but we have also held that where there is strong testimony of an alibi a conviction will not be upheld. Admittedly Rose is a common and habitual criminal and although he entered a plea of guilty to this robbery he has never yet been sentenced. It could well be that he is hoping for clemency in consideration for his turning State's evidence in this case.
* * * * * *
In the case of White v. State, 146 Miss. 815, 819, 112 So. 27, 28, we said: "Putting the case differently somewhat, we have a conviction here based alone on the testimony of an alleged accomplice who is a common thief and a common liar, and, in addition, whose story itself has many of the earmarks of falsehood. We do not think it amounted to any substantial evidence at all. Under the authority of Hunter v. State, 137 Miss. 276, 102 So. 282, and Abele v. State, 138 Miss. 772, 103 So. 370, we think the appellant was entitled to a directed verdict of not guilty."
* * * * * *
In Creed v. State, 179 Miss. 700, 705, 176 So. 596, 597, we said: "The rule is well settled that, while a conviction may be sustained on the uncorroborated testimony of an accomplice, it is equally well settled that such a conviction should not be upheld where such testimony is improbable, self-contradictory, and unreasonable on its face, and especially where it is impeached by unimpeached witnesses. Day v. State (Miss.), 7 So. 326; Wright v. State, 130 Miss. 603, 94 So. 716; Hunter v. State, 137 Miss. 276, 102 So. 282; Abele v. State, 138 Miss. 772, 103 So. 370; White v. State, 146 Miss. 815, 112 So. 27; Matthews v. State, 148 Miss. 696, 114 So. 816; Boutwell v. State, 165 Miss. 16, 143 So. 479; Harmon v. State, 167 Miss. 527, 142 So. 473; Rutledge v. State, 171 Miss. 311, 157 So. 907; Carter v. State (Miss.), 166 So. 377.
* * * * * *
We have given careful consideration to the facts of this case and we have reached the conclusion that the evidence for the State, based solely upon the testimony of the witness Rose, the alleged accomplice, is so thoroughly impeached by the appellant's alibi that the judgment of conviction ought not to stand and that the appellant was entitled to the peremptory instruction which he requested.
228 Miss. at 870-872, 89 So.2d at 850-851.
In the light of Pegram, supra, and Burks, supra, (so far as the latter has application), Jones' conviction should not be allowed to stand.
An examination of the record of competent evidence reflects that Jones' conviction rests upon the uncorroborated testimony of Hawkins, a convicted felon and confessed accomplice, whose sentence was deferred pending the trial of Jones. As this Court said in Pegram, it is only reasonable to assume that under such circumstances Hawkins was under some constraint and had some wish not to offend the prosecuting authorities. Moreover, under all the authorities, his testimony must be viewed with caution and suspicion. It must not be "improbable, self-contradictory, and unreasonable on its face, and especially where it is impeached by unimpeached witnesses." *1270 Here, Hawkins' veracity is also impeached by proof of his conviction of this felony. We have concluded that Hawkins' testimony, thus viewed, did not amount "to any substantial evidence at all."
The testimony of Williams, placed on the stand in an effort to identify Jones as the man who had paid $10.00 to have him pull a van-type truck out of a ditch (the van itself, Williams said, was being driven by another and unidentified person) is refuted by the positive testimony of witnesses that Jones was elsewhere at the time the incident occurred. Also, there is an absence of any cogent explanation of how the incident fitted in with the story of the larceny as related by Hawkins. Considering that this witness had never seen Jones before and saw him on the occasion in question only for a few moments late at night, with a "yard light" supplying the only illumination, the witness testifying that it was "pretty dark", coupled with the suggestive procedure followed by the officers in taking the witness specifically to find Jones to be identified as this man, with the final admission of Williams that he was uncertain of the identification, taken all together, effectively destroy the probative value of Williams' testimony as an identification of Jones.
Although we have considered the effect of the decision of the United States Supreme Court in Burks, supra, on the case now before us, we have concluded that it is not necessary to resort to it in the disposition of the present case which we believe falls within the rule laid down in Pegram, supra. Under the rule there stated, and under the totality of the circumstances, the conviction of Jones must be reversed and Jones discharged.
REVERSED AND APPELLANT DISCHARGED.
PATTERSON, C.J., ROBERTSON, P.J., and BROOM, LEE, BOWLING and COFER, JJ., concur; PATTERSON, C.J., specially concurs.
SUGG and WALKER, JJ., dissent.
PATTERSON, Chief Justice, specially concurring:
I concur in the result of the majority opinion. The question is whether there is sufficient evidence to sustain the conviction of Jones. If not, the issue is whether there should be a remand for a new trial or whether Jones should be discharged.
In Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the same issue was before the Court:
... Given this posture, we are squarely presented with the question of whether a defendant may be tried a second time when a reviewing court has determined that in a prior trial the evidence was insufficient to sustain the verdict of the jury.
(437 U.S. at 5, 98 S.Ct. at 2144, 57 L.Ed.2d at 5)
With this issue defined, the Supreme Court concluded:
The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials. The Clause does not allow "the State ... to make repeated attempts to convict an individual for an alleged offense," since "the constitutional prohibition against `double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." ...
Nonetheless, as the discussion in Part II, supra, indicates, our past holdings do not appear consistent with what we believe the Double Jeopardy Clause commands. A close reexamination of those precedents, however, persuades us that they have not properly construed the Clause, and accordingly should no longer be followed.
(437 U.S. at 11, 98 S.Ct. at 2147, 51 L.Ed.2d at 9)
In my opinion, Burks controls this case and although I have no quarrel with Pegram v. State, 228 Miss. 860, 89 So.2d 846 *1271 (1956), I would not follow it because its concurring opinion voices the theory of remand even though there was insufficient evidence to support the conviction. The vestige of remand where there is insufficient evidence to support a conviction has been supplanted by Burks, supra, in my opinion, and I would forthrightly so hold.
SUGG, Justice, dissenting:
I dissent because the evidence in this case presented a question for the jury.
The rule for reviewing the sufficiency of evidence in a criminal case was stated in Carroll v. State, 196 So.2d 878 (Miss. 1967) as follows:
In reviewing the sufficiency of the evidence to support the verdict, this Court must accept as having been established all that was proved by the evidence, as well as all that such evidence reasonably tended to prove, together with all reasonable inferences to be drawn therefrom, favorable to the theory of the prosecution. (196 So.2d at 883).
When the evidence in this case is measured by the above rule it is sufficient to support the verdict of the jury.
The majority opinion is based on the premise that the principal evidence of the defendant came from the lips of his accomplice. We have stated many times that an accomplice's testimony will be viewed with great caution and suspicion and must be reasonable and not improbable or self contradictory, or substantially impeached. Simpson v. State, 366 So.2d 1085 (Miss. 1979); Black v. State, 336 So.2d 1302 (Miss. 1976). The testimony of the accomplice shows that the defendant participated in the crime, and the extent of his participation is set forth fully in the majority opinion. The case is reversed primarily because two witnesses for the defendant testified that the defendant checked into a motel in Cleveland, Mississippi at 10:09 p.m. on the night of the crime and concluded that it was impossible for the defendant to have been seen in Indianola by the state's witness, Charles Williams.
Williams testified that he was a farmer and a cotton gin operator who lived a short distance north of the intersection of Highway 82 and Highway 49. A careful analysis of his testimony reveals that it would have been possible for the defendant to have checked into the motel at Cleveland at 10:09 and also to have been present at the Williams farm at the time testified by Williams.
Williams was plowing in a field next to his house and observed a station wagon proceed to the end of the dead end road leading to his house, turn around and return. About 11:00 p.m. the witness' aunt stopped by the field and told Williams that a truck was in a ditch. The truck met the description of the U-Haul truck which Clarence Hawkins had rented and used to transport the stolen tractor to Arkansas. When Williams and his aunt parked in Williams' driveway a man driving a green Ford station wagon asked Williams if he could pull the truck out of the ditch. Williams pulled the truck out of the ditch and the man, later identified as the defendant, paid Williams $10.00.
Williams identified the green station wagon when he viewed it at the residence of the defendant and, on direct and redirect examination, positively identified the defendant as the driver of the station wagon. On cross-examination the following questions and answers were given:
Q. I believe when you were talking to me, didn't you say  of course, any positive identification is difficult, and I believe you stated that you were reasonably sure, or something to that effect, although not absolutely positive.
A. Yes.
Q. That's what you told me?
A. Yes.
Q. That out of all the people you have been shown, that this one came the closest?
A. Yes, sir.
Q. That is what you told me?
A. Yes, sir.
On cross-examination the witness stated he had been carried to the Cleveland Ford *1272 Tractor place to see if he could identify defendant, but the defendant was not present. On direct examination the witness said that he had never seen the defendant "before or since, that I know of."
Defendant's witness, Eugene Tarsi, stated that he measured the distance from Cleveland to the intersection of Highways 82 and 49 in Indianola and found the distance to be 32 miles. Williams testified that he lived .8 of a mile off of Highway 49 on a road which intersected Highway 49 a distance of 1.7 miles north of the intersection of Highways 82 and 49. The distance from Cleveland to Williams' home was 31.1 miles.
Assuming that the defendant and his ex-wife checked into a motel in Cleveland at 10:09 p.m. it would have been possible for him to have driven the 31 miles to the road leading to Williams' home and arrive there at approximately 20 minutes before eleven o'clock.
Williams did not check his watch to determine the exact time, but stated that his aunt told him about 11:00 p.m. that the truck was in the ditch, and that he had seen the green station wagon about 20 or 30 minutes earlier. The jury was justified in finding that it was possible for the defendant to have checked into the motel and arrived at the Williams farm at the time testified to by Williams.
Another factor should be noted. Assuming that it was impossible for the defendant to have checked into the motel at 10:09 and arrived at the Williams farm as testified to by Williams the jury had the right to say which witness they would believe. Defendant was a married man and one of his corroborating witnesses was his ex-wife with whom he spent Saturday night in a motel in Cleveland. The other witness was the clerk at the motel who observed a man that he identified as the defendant sitting in a car outside the office. The motel clerk stated that he could see the man and was positive of his identification; however, it was solely the province of the jury to determine whether the identification of the defendant by the clerk under the lighting conditions then existing, was definite and certain enough to establish defendant's alibi. Obviously the jury did not believe defendant's alibi.
I am of the opinion also that the testimony with reference to the ramps used to load and unload the tractor shows that defendant had some direct participation in the larceny of the tractor. Clarence Hawkins testified that defendant called him on February 19, 1977 to rent a U-Haul truck and bring it to Cleveland. Hawkins rented the U-Haul truck in Indianola around noon and delivered it to the parking lot across from the hospital in Cleveland as directed by the defendant. Defendant's ex-wife, with whom he spent Saturday night, worked at the hospital. Hawkins stated that defendant drove him in the station wagon to Indianola arriving between 3:30 and 4:30 p.m. Defendant called Hawkins around 6:00 o'clock p.m. and told Hawkins he would get back in touch with him later that night. Defendant testified about a telephone bill from Cleveland Ford Tractor, Inc. which was introduced and showed a telephone call, charged to Cleveland Ford Tractor, Inc., made to the number of Hawkins Shoe Shop in Indianola at 6:14 p.m. Defendant was employed by Cleveland Ford Tractor, Inc. as Service Manager.
The ramps were introduced in evidence and identified by Charles Lane Miller who stated that he lent the ramps to Al Erwin. The ramps were not returned so Miller requested defendant and Al Erwin to return the ramps to him. Defendant told him that the ramps were not there, but he and Al Erwin had Prestage Machinery Company build ramps to replace the ones that Miller had lent Erwin. According to Miller's recollection defendant and Al Erwin each agreed to pay one-half of the cost of the replacement ramps. Defendant admitted he helped Al Erwin arrange to replace the ramps because Clarence Hawkins had them and was unable to return them.
It thus appears that the ramps used to load and unload the stolen tractor were in the possession of the defendant, and when the owner called upon him to return the *1273 ramps he arranged for a replacement for the ramps which could not be returned.
Taking all the evidence in the light most favorable to the state, as we must under Carroll, supra, it is my opinion it supports the jury's verdict.
I would affirm.
WALKER, J., joins in this dissent.