GRIFFIS, J,
 

 for the Court:
 

 ¶ 1. Derrick Turner was convicted for capital murder under Mississippi Code Annotated section 97-3-19 (Rev.2006). The Oktibbeha County Circuit Court sentenced Turner to life without the possibility of parole in the custody of the Mississippi Department of Corrections. On appeal, Turner claims that: (1) there is insufficient evidence to support his conviction; (2) the circuit court improperly denied his jury instruction on the impeachment of witnesses; (8) the circuit court improperly denied his jury instruction requiring acquittal where an accomplice’s testimony was impeached, unreasonable, or self-contradictory; and (4) the verdict is against the overwhelming weight of the evidence. We find no error and affirm.
 

 FACTS
 

 ¶ 2. On August 20, 2001, the Starkville Fire Department responded to a house fire at 226 Reed Road in Starkville, Mississippi. During their search of the home, they discovered Juanita Miller, who had been severely beaten. Six separate fires had been deliberately set in various rooms of the house. The house was ransacked and the belongings of Juanita and her husband, Lee Miller, had been pulled out of drawers and closets. Approximately $600 was stolen.
 

 ¶ 3. Lee had left the house at approximately 8:45 a.m. to visit two car washes that he owned. When he returned home at approximately 9:45 a.m., he found emergency personnel attempting to resuscitate Juanita. Juanita later died from her wounds, which had caused swelling of and bleeding from her brain.
 

 ¶ 4. The Starkville Police Department’s investigation led to a suspect named Devail Hudson. A search dog was used to track Hudson’s scent from a nearby trailer park to the back door of the Millers’ home and then back to the trailer of Hudson’s girlfriend.
 

 ¶ 5. Lieutenant William Lott testified that the investigation stalled until January 6, 2002, when Bentore Riley contacted the
 
 *1125
 
 police department. Riley was concerned for his mother’s safety because he had been threatened by the people who had broken into the Millers’ home. Riley gave a statement to the police detailing what he knew about the events of August 20, 2001. Riley admitted that he had been the lookout, and he was arrested for his involvement in the crime.
 

 ¶ 6. At trial, Riley testified that he saw Turner, Hudson, Demarcus Evans, James Pastor, Willie Prater, Josh Wood, and Destiny Moore standing at the corner of Northside Drive and Westside Drive — an intersection near Lander’s Trailer Park and the Millers’ home — at approximately 9:00 a.m. on August 20. Riley and Moore began to argue because Moore was wearing Riley’s tennis shoes. Hudson told Moore to return the shoes to Riley. Moore went across the street to his house to get another pair of shoes.
 

 ¶ 7. Riley heard Hudson say to the group, “Let’s go.” Prater asked, ‘What are you going to do?” Hudson responded, “We fixing to go over there to that woman’s house and see what she’s got in there.” Prater asked, “What we going to do if she finds us in there?” Hudson said, “We’re going to kill her.” Riley testified that the group forced him to act as their lookout.
 

 ¶ 8. Riley watched the group enter the Millers’ back door. Riley saw Turner run out of the house and fall onto the grass. The rest of the group ran from the house, and Hudson and Prater were the last to leave. Riley stated that the group returned to the trailer park. Riley testified that he attempted to call the police, but he was unsuccessful.
 

 ¶ 9. Denise Stephens testified that she was delivering Meals-on-Wheels on the morning of August 20, 2001. She said she usually turns her car around at the entrance to Lander’s Trailer Park located at the corner of Westside Drive and North-side Drive. That morning, she was unable to turn around because a group of four or five men was standing at the entrance. Of those in the group, she recognized only Hudson and Riley.
 

 ¶ 10. Lt. Lott testified that he took a statement from Turner on January 14, 2002. Turner said that he went to work at 7:00 a.m. on August 20, 2001, and worked until 4:80 p.m. Turner told Lt. Lott that he worked for Hodges Construction installing pipe on the Highway 25 bypass. Lt. Lott contacted Hodges Construction and was informed that Turner was not employed there on August 20, 2001.
 

 ¶ 11. Turner was called back to the police station to give a second statement. He again said that he was at work with Hodges Construction at the time of the crime. When Lt. Lott told Turner that Turner did not work for Hodges Construction on August 20, 2001, Turner stated that he must have been at home asleep that day. Dina Addy, a business manager at Hodges Construction, testified that Turner’s first day of employment was September 11, 2001.
 

 ¶ 12. Turner’s mother, Mary Turner, testified that Turner drove her to Tupelo, Mississippi, on the morning of August 20, 2001. They went to visit her daughter and Turner’s sister, Sherbert Burkhalter. Mary said that she remembered the date because when she returned to work the following day, some of her customers were talking about Juanita’s murder.
 

 ¶ 13. Burkhalter also testified that Turner and his mother had visited her in Tupelo on August 20th. She was employed at Hardee’s, and she said that Mary and Turner had visited her at work. Turner, who was unemployed at the time, filled out an application to work at Har-dee’s. The application is dated August 20,
 
 *1126
 
 2001. However, Burkhalter admitted on cross-examination that the applications could be taken from the store, filled out at a later time, and dated and returned whenever the applicant chose.
 

 ¶ 14. The jury found Turner guilty of capital murder, and Turner was sentenced to life without the possibility of parole.
 

 ANALYSIS
 

 1. Whether there was sufficient evidence to support Turner’s conviction.
 

 ¶ 15. There was no dispute at trial as to the crime that occurred. Overwhelming evidence was presented to prove that Juanita was brutally beaten in the course of a robbery and that her injuries resulted in death. The disputed issue during the trial was whether Turner was one of the people involved in the crime. In order to prove his involvement, the State presented the testimony of Riley, an accomplice who the State had also charged with capital murder. Turner claims that Riley’s testimony was unreliable and was insufficient to prove that Turner had participated in Juanita’s murder.
 

 ¶ 16. When reviewing the denial of a motion for a directed verdict on an objection to the legal sufficiency of the evidence, we examine the evidence in a light most favorable to the State to determine whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Bush v. State,
 
 895 So.2d 836, 843 (¶ 16) (Miss.2005) (citation omitted). “[T]he jury is charged with the responsibility for weighing and considering conflicting evidence and the credibility of witnesses.”
 
 Neal v. State,
 
 451 So.2d 743, 758 (Miss.1984).
 

 ¶ 17. Turner argues that Riley’s accomplice testimony cannot support Turner’s conviction because it was uncorroborated testimony that was unreasonable, self-contradictory, or substantially impeached. The supreme court set forth this standard for using accomplice testimony in
 
 Jones v. State,
 
 368 So.2d 1265, 1269 (Miss.1979), stating:
 

 The rule is well settled that, while a conviction may be sustained on the uncorroborated testimony of an accomplice, it is equally well settled that such a conviction should not be upheld where such testimony is improbable, self-contradictory, and unreasonable on its face, and especially where it is impeached by unimpeached witnesses.
 

 Id.
 
 (quoting
 
 Creed v. State,
 
 179 Miss. 700, 705, 176 So. 596, 597 (1937)).
 

 ¶ 18. In
 
 Evans v. State,
 
 460 So.2d 824, 826-27 (Miss.1984), the supreme court elaborated upon
 
 Jones,
 
 holding:
 

 the uncorroborated testimony of an accomplice may be sufficient to convict an accused.
 
 Where there is slight convbo-rative evidence,
 
 the accomplice’s testimony is likewise sufficient to sustain the verdict. However, such testimony should be viewed with great caution and suspicion and must be reasonable, not improbable, self-contradictory or substantially impeached.
 

 (Emphasis added).
 

 ¶ 19. Riley gave his first statement to the police at 8:30 a.m. on January 6, 2002, stating the following:
 

 The day the old lady was killed (08-20-01) before she was killed at Reed R[oa]d ... I had walked to my grandma’s and got a pear. When I was walking back down Northside, I cam[e] to [the] corner of Northside and Westside. Standing at the stop sign at the corner were James Paster, Willie Prater, Destiny Moore, “Little Mark” (real name unknown)[,] Devail Hudson, and another tall[,] skinny[,] black male with two front teeth
 
 *1127
 
 missing named Derwin. I notice Destiny Moore had on a pair of grey Nautiea tennis shoes. I had a pair of grey Náu-tica tennis shoes without the laces stolen from my house. Destiny and I started to get into it because he had my shoes. Devail told Destiny to give me my shoes. While I was there Devail was talking about robbing that lady, someone said [what] are you gonna do to the lady? Devail said, I’m gonna rob that old white b* ⅜ *h, I know she got [sic] something. Then Willie Prater said to Devail, “Are you gonna kill that old lady?” Devail said, ‘Yeah, I’m gonna kill her.” Devail wanted to see what the old lady had. After, I got my shoes from Destiny, Devail said let’s go and James Paster, Willie Prater, Destiny Moore, “Little Mark,” Devail Hudson and Derwin started going to the old lady’s house at the corner of Reed R[oa]d and Westside. I was walking toward[] my house at Lander’s Trailer Park, I got to the gate at [the] entrance to Westside for Lander’s Trailer Park, I saw all them go into the old lady’s house. Then a little later, I saw Derwin run out [of] the house and fall down. Then Prater went on Reed [Road] from the house. Destiny went to his house. Devail and the other guys ended up in Lander’s Trailer Park but Little Mark and Destiny went to Destiny’s house. I went to my house. But I saw Devail go back into the house again. I didn’t see him leave this time. I walked down to the store to meet my mother. I think Devail went back into the house to kill the old lady and burn the house down. Then later I saw De-vail give Derwin a watch that Devail had. It was a silver watch, a Nautiea watch. Devail gave this watch to Der-win because he was talking about what they got out of the house, meaning the old lady’s house. Derwin told Devail, I had to get out of there for what y’all were doing. Devail said, ‘You like this watch.” Derwin said you got it free handed. Devail didn’t say anything. One of the guys said there goes Bubba. I said y’all are gonna get caught, in my mind. They were gonna get the same thing done to them for killing the old lady. Devail had changed clothes the second time I saw him after he went back into the old lady’s house. Devail was wearing blue colored clothes and changed into something different after he robbed the house. When Devail said he was gonna kill the old lady, I had no doubt in my mind he would kill, but I wasn’t around to see it. Devail was saying at the stop sign he didn’t want to wear a particular shoe when he robbed the old lady. Destiny went to his house and got another pair of shoes. Destiny lives right near the stop sign at North-side and Westside. Then they went and robbed the old lady. I feel it is the right thing to do to tell the police what happened to the old lady. I would want someone to do the same thing I did if it was my family.
 

 Riley gave a second statement at 4:10 p.m. that day, stating:
 

 On 08-20-01[,] Devail Hudson, Willie Prater, Destiny Moore, James Paster, Demarcus Evans and Derrick Turner threatened me. Destiny Moore was wearing my grey Nautiea Shoes. They told me I was gonna be their lookout for robbing the old lady at Reed R[oa]d and Westside. They said my shoes had already been there. I didn’t want to be the lookout, I was scared. Willie Prater said to suck it up, stop[ ] being a b* * *h. Devail said[,] “Let’s go,” and they all went inside the old lady’s house. I did watch out for them[,] but I didn’t want to. Derrick Turner was the first to run out[,] and he fell down. They all later came out of the house and met up
 
 *1128
 
 at Lander’s Trailer Park. Then Devail went back into the house by himself. I saw him go back in the door as I went up the road. I didn’t want to be around them anymore. I didn’t get any cut from the robbery. I knew Devail was gonna kill her.
 

 ¶ 20. We must first determine whether Riley’s testimony is uncorroborated as Turner contends. We find that the record shows that the State offered some corroboration of Riley’s account. Even though Riley’s first statement referred to Turner as Derwin instead of Derrick, Riley described Turner as a “tall, skinny, black male with two front teeth missing.” Turner’s mother, Mary, testified that this description correctly described Turner. Riley further testified that he had seen the group of men enter the Millers’ back door from where he was standing at the corner of Northside Drive and Westside Drive. Lt. Lott testified that, during his investigation, he was able to see the Millers’ back door from that spot. Also, the search dog’s handler testified that the search dog tracked Hudson’s scent to and from the back door of the Miller’s home indicating that Hudson had entered through the back door as Riley stated.
 

 ¶ 21. Stephens testified that she saw a group of men — including Hudson and Riley — standing at the entrance of Lander’s Trailer Park on the morning of August 20, 2001. Her statement corroborates Riley’s testimony that he was with the group of men at the entrance to the trailer park on the morning of the murder.
 

 ¶ 22. Even if we conclude that this amounts to only slight corroboration of Riley’s testimony, we find that his account of Turner’s involvement in the crime was not unreasonable, improbable, self-contradictory, or substantially impeached. Turner claims that Riley’s testimony was all of these things because Riley, who was also charged with capital murder in 2002, filed certain pro se pleadings in his case under the alias Q. Marqelilous Tirgger. In those pleadings, Riley falsely claimed to be married with children. Riley admitted that he had filed these falsified court documents to bring attention to his pending case.
 

 ¶ 23. Turner further claims that Riley’s testimony is untrustworthy because Riley has been charged in the crime. Turner argues that the State does not believe its own witness because, despite Riley’s assertion that he was not involved in the murder, the State has maintained its charge against Riley. However, there is a distinction here. Riley claims that he was not involved in the plan or the actions taken to rob and murder Juanita. But Riley admitted that he had acted as a lookout for the group because he was afraid of and threatened by Hudson. Riley’s role as the lookout, to which he admitted, was the basis of his arrest. That the State maintained the charge against Riley does not prove any untruth in Riley’s testimony.
 

 ¶ 24. Lt. Lott testified that Riley had lied to him on four occasions: (1) Riley claimed to have called 9-1-1 on the day of the murder, although there is no record of that call; (2) Riley claimed that he gave a statement to an officer on the day of the murder, although he was never interviewed by law enforcement until January 6, 2002; (3) he referred to the defendant as Derwin, not Derrick, in his first statement; and (4) he did not admit that he was the lookout until he made his second statement. Lt. Lott testified that, despite these lies by Riley, he believed Riley’s testimony as to Turner’s involvement in the crime.
 

 ¶ 25. Riley’s description of Turner was never contradicted. In his first statement, Riley described a man named Derwin who was a tall, skinny, black male missing two front teeth. The State presented evidence
 
 *1129
 
 that Riley and Turner worked at the same construction company with a man named Derwin. The State must be given the benefit of all reasonable inferences that may be drawn from the evidence.
 
 Corbin v. State,
 
 585 So.2d 713, 715 (Miss.1991). Riley gave an exact description of Turner; it is reasonable to infer that Riley mistakenly called Turner by the wrong name in the first statement. Riley clearly named Turner as one of the perpetrators in his second statement.
 

 ¶ 26. We cannot hold that a reasonable jury could not give any credit to Riley’s testimony as a result of his lies. All of the lies, except the issue of Turner’s name, relate to Riley’s potential involvement in the murder. It is entirely reasonable that Riley was able to give an account of what he saw yet attempt to distance himself from any involvement in the crime. Riley’s statements identifying Turner as one of the men who went inside the Millers’ home were not impeached. The jury was able to weigh the credibility of Riley’s testimony. There was sufficient evidence to support the jury’s decision. Accordingly, this issue has no merit.
 

 2. Whether the circuit court improperly refused Turner’s requested jury instruction on the impeachment of witnesses.
 

 ¶ 27. Turner claims that the circuit court improperly refused Turner’s requested jury instruction on the impeachment of witnesses. Specifically, he argues that because the State admitted that Riley had been untruthful in his prior statements to the police, the circuit court was required to give the impeachment instruction. The State counters that the jury’s duty to weigh the testimony was covered in another instruction.
 

 ¶28. “Whether to give a jury instruction is within the sound discretion of the trial court.”
 
 Chamberlin v. State,
 
 989 So.2d 320, 341-42 (¶ 80) (Miss.2008) (citation omitted). We review the jury instructions given as a whole to determine whether the refusal of a particular instruction was in error.
 
 Taylor v. State,
 
 763 So.2d 913, 915 (¶8) (Miss.Ct.App.2000). If the instructions fairly state the law of the case and no injustice is created, no reversible error will be found.
 
 Id.
 
 “A defendant is entitled to have jury instructions given which present his theory of the case[;] however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.”
 
 Poole v. State,
 
 826 So.2d 1222, 1230 (¶ 27) (Miss.2002) (quoting
 
 Smith v. State,
 
 802 So.2d 82, 88 (¶ 20) (Miss.2001)).
 

 ¶ 29. Turner offered Instruction D-2, which states:
 

 The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial.
 

 Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true. You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness.
 

 If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves. I remind you that a defendant has the right not to testify. When the defendant does testify, however, his
 
 *1130
 
 testimony should be weighed and his credibility evaluated in the same way as that of any other witness.
 

 ¶ 30. There seems to be no dispute as to whether this instruction was a correct statement of the law or whether it had a foundation in the evidence. We are asked to determine whether it was sufficiently covered elsewhere in the instructions. The State points us to the circuit court’s Instruction C.01, which states in part:
 

 You are the sole judges of the facts in this case. Your exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.
 

 ¶ 31. Turner acknowledges
 
 Swann v. State,
 
 806 So.2d 1111, 1117 (¶¶ 23-24) (Miss.2002), where the supreme court held that a general instruction on the weight and credibility of a witness, together with the cross-examination and closing argument that reveal the inconsistencies in a witness’s testimony, is a basis to refuse an impeachment instruction. But Turner maintains that the holding in
 
 Swann
 
 does not apply when the witness admits he has lied or the State concedes that the witness has lied. He cites
 
 Ellis v. State,
 
 790 So.2d 813 (Miss.2001) to support this argument. However, we find that
 
 Ellis
 
 is distinguishable from this case.
 

 ¶ 32. Antwon Ellis’s conviction for murder was based largely upon the testimony of his accomplice, Kendaryll Robinson.
 
 Id.
 
 at 814 (¶ 2). Robinson testified that, while acting as a lookout, he heard a gunshot and saw a man fall to the ground.
 
 Id.
 
 He looked up and saw Ellis shooting at the victim.
 
 Id.
 
 Robinson admitted that he had lied when he first told the police that he had not seen anyone fire any shots.
 
 Id.
 
 at (¶3).
 

 ¶ 33. At trial, Ellis requested an impeachment instruction. The circuit court refused Ellis’s instruction and gave its own general instruction about weighing the credibility of witnesses.
 
 Id.
 
 at (¶ 4). Importantly, a cautionary instruction concerning the testimony of an accomplice was not given.
 
 [1]
 

 Id.
 
 at 816 (¶ 8). Robinson directly contradicted his own statement that was at the heart of the issue — whether Ellis was involved in the crime.
 
 Id.
 
 at (¶ 9). The supreme court reversed Ellis’s conviction and remanded the case for a new trial.
 
 Id.
 
 at 817 (¶ 10).
 

 ¶ 34. Here, unlike
 
 Ellis,
 
 the jury was instructed to consider and weigh Riley’s testimony as an accomplice with great care, caution, and suspicion. The two cases are similar in that the accomplices both lied at some point in their prior testimonies. However, there is a distinction.
 

 ¶ 35. In
 
 Ellis,
 
 the accomplice contradicted his statement that Ellis was involved in the crime. That was the key issue before the jury. Here, Riley was shown to have lied about four matters: he said he had called 9-1-1; he said he had given a statement to an officer on the day of the murder; he referred to Turner as Derwin instead of Derrick; and he did not immediately admit that he had acted as a lookout. These inconsistencies do not go to the ultimate issue of whether Turner was one of the men involved in the crime. The only one related to Turner is the
 
 *1131
 
 mistaken name. As discussed above, Riley did give the wrong name initially, but he gave a perfect description of Turner despite the error in the name. It is evident that Riley was attempting to avoid punishment for his role in the crime by denying his involvement as the lookout and by claiming that he had called the police to report the crime.
 

 ¶ 36. However, these inconsistencies were fully revealed during cross-examination and closing argument. The jury was aware that it should take caution when considering Riley’s accomplice testimony. According to
 
 Swann,
 
 we conclude that the circuit court’s refusal of Turner’s requested impeachment instruction was not an abuse of discretion; therefore, this issue has no merit.
 

 3. Whether the circuit court improperly denied Turner’s jury instruction requiring acquittal where an accomplice’s testimony was impeached, unreasonable, or self-contradictory.
 

 ¶ 37. Turner argues that the jury should have been instructed that he could not be convicted based on the uncorroborated testimony of an accomplice when that testimony was impeached, unreasonable, or self-contradictory. At trial, Turner offered Instruction D-8, which states:
 

 The Court instructs the jury that the uncorroborated testimony of an accomplice that is unreasonable, self-contradictory or substantially impeached at trial is not enough to convict an accused of an offense. If you find that Bentore Riley’s testimony was either unreasonable, self-contradictory, or substantially impeached, his testimony alone may not be used to convict Derrick Turner of capital murder.
 

 ¶ 38. The State objected and argued that the instruction went to the sufficiency of the evidence, which was a question of law for the circuit court to determine. The circuit court agreed and further held that the instruction was repetitious and a comment on the witness’s testimony.
 

 ¶ 39. Turner essentially makes the same argument as in his first assignment of error — there was insufficient evidence to convict Turner based on the impeached, unreasonable, or self-contradictory testimony of Riley. He claims that the jury should have been instructed on that point. However, the sufficiency of the evidence is an issue of law.
 
 Hughes v. State,
 
 735 So.2d 238, 279 (¶ 195) (Miss.1999). The jury was not required to make such a conclusion of law.
 

 ¶ 40. Turner cites this Court’s decision in
 
 Riley v. State,
 
 1 So.3d 877 (Miss.Ct.App. 2008) in support of his argument. James Riley argued that the verdict was against the overwhelming weight of the evidence because his accomplice had testified that the firearms Riley possessed were stolen.
 
 Id.
 
 at 882 (¶ 16). As a part of our analysis, we quoted the instruction given to the jury, which stated:
 

 if you find the testimony of Martin Ick-om, an alleged accomplice of the defendant in this case, to be uncorroborated by other evidence, then and in that event, you should view such testimony with great caution and suspicion and that it must be reasonable and not improbable or self-contradictory or substantially impeached.
 

 Id.
 
 at (¶ 18). We held that jury instructions like this ensured that the jury “viewed the evidence with the proper amount of skepticism”; therefore, the verdict was not against the overwhelming weight of the evidence.
 
 Id.
 

 ¶ 41.
 
 Riley
 
 is unlike this case in two respects. First, the issue in
 
 Riley
 
 was whether the verdict was against the overwhelming weight of the evidence — a deter
 
 *1132
 
 mination to be made by an appellate court after a conviction. No issue was ever raised as to whether the jury instruction was proper. Nor did this Court comment that the jury instruction given in
 
 Riley
 
 was required. This Court merely quoted the instruction given to the jury as evidence that the jury’s verdict acknowledged the suspicion placed upon the testimony of an accomplice.
 

 ¶ 42. Second, the jury instruction given in
 
 Riley
 
 is much different from Turner’s proposed Instruction D-8. The instruction in
 
 Riley
 
 informed the jury that it should weigh the uncorroborated testimony of an accomplice with great caution. Instruction D-8 states the principle of law that a defendant may not be convicted solely on the uncorroborated testimony of an accomplice when that testimony is impeached, unreasonable, or self-contradictory. Our decision in
 
 Riley
 
 does not support Turner’s argument that his proposed instruction was required. We find no abuse of discretion in the circuit court’s refusal of Instruction D-8; thus, this issue is without merit.
 

 Jh Whether the jury’s verdict is against the overwhelming weight of the evidence.
 

 ¶ 43. Lastly, Turner contends that the jury’s verdict is against the overwhelming weight of the evidence. Specifically, he claims that the weight of the evidence favored him if the discrepancies in Riley’s testimony were compared to his alibi evidence.
 

 ¶ 44. “When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush,
 
 895 So.2d at 844 (¶ 18). The evidence is weighed in the light most favorable to the verdict.
 
 Id.
 
 The power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.
 
 Id.
 
 If the verdict is against the overwhelming weight of the evidence, the proper remedy is to grant a new trial.
 
 Id.
 

 ¶45. We have discussed Riley’s testimony at length above. To rebut Riley’s testimony, Turner presented several alibi witnesses. His mother and sister testified that Turner was in Tupelo on the morning of the murder. Turner presented an application for employment at Hardee’s in Tupelo. The application was dated the same day as the murder; however, it was admitted that the date on the application could not be verified.
 

 ¶ 46. Riley’s testimony was not the only evidence that refuted Turner’s alleged alibi. In Turner’s original statement to the police, he claimed that he was at work with Hodges Construction on the morning of the murder. When the police told Turner that he was not yet employed at Hodges Construction at that time, Turner claimed that he must have been at home asleep. He never stated that he was in Tupelo that morning.
 

 ¶ 47. Weighing the evidence in the light most favorable to the verdict, we find that the jury’s verdict is not contrary to the overwhelming weight of the evidence. Allowing the verdict to stand does not sanction an unconscionable injustice. Accordingly, this issue is without merit.
 

 ¶ 48. THE JUDGMENT OF THE CIRCUIT COURT OF OKTIBBEHA COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL
 
 *1133
 
 COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., BARNES, ISHEE, ROBERTS CARLTON AND MAXWELL, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.
 

 [1]
 

 . The test announced by the
 
 Ellis
 
 court to determine whether a cautionary instruction should be given has been overruled by
 
 Williams v. State,
 
 32 So.3d 486, 491 (¶ 17) (Miss.2010). Even so, the distinction remains that there was no instruction in
 
 Ellis
 
 that cautioned the jury about its reliance upon accomplice testimony.